**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

GLOBAL CAPITAL PARTNERS LLC and ACCESS MANAGEMENT, S.A.S., INC., )
)
)
Plaintiffs, )
)
v. )    C.A. No. 2024-0877-JTL
)
GREEN SAPPHIRE HOLDINGS, INC. )
)
Defendant. )
)

ALPHA CARTA, LTD., )
)
Third-Party Plaintiff-Intervenor, )
)
v. )
)
GREEN SAPPHIRE HOLDINGS, INC., and GLOBAL CAPITAL PARTNERS, LLC, )
)
)
Defendants. )

## POST-TRIAL OPINION

Date Submitted: December 12, 2025
Date Decided: March 13, 2026

Philip Trainer, Jr., Samuel M. Gross, ASHBY & GEDDES, P.A., Wilmington, Delaware; Kenneth J. Pfaehler, Nicholas W. Petts, DENTONS US LLP, Washington, District of Columbia; *Attorneys for Global Capital Partners, LLC and Access Management, S.A.S., Inc.*

Sidney S. Liebesman, J. Peter Shindel, Jr., Seth A. Niederman, Joshua K. Tufts, FOX ROTHSCHILD LLP, Wilmington, Delaware; Marc P. Trent, TRENT LAW FIRM, P.C., Chicago, Illinois; *Attorneys for Alpha Carta, Ltd.*

Sean J. Bellew, BELLEW LLC, Wilmington, Delaware; *Attorneys for Green Sapphire Holdings, Inc.*

**LASTER, V.C.**

A lender loaned $10 million to a borrower, secured by the borrower's equity interest in a subsidiary that owned real estate. The borrower defaulted, and the lender demanded repayment. To settle the dispute, the borrower agreed that the lender owned the subsidiary's equity. But the borrower never recognized that the lender had gained control of the subsidiary and, through it, the real estate. After the borrower interfered with the lender's ability to access the real estate, the lender and the subsidiary filed suit seeking equitable relief to secure their rights.

The borrower and a third-party intervenor have done their best to turn that simple story into a huge mess. Although nominally adverse parties, a single human controls them both.

A.R. Thane Ritchie is a former hedge fund manager turned secretive international investor who set up a multi-entity structure to manage his wealth. Through the Petro Carta Trust (the "Family Trust"), Ritchie controls and manages assets for his family's benefit. Through the Family Trust, Ritchie controls defendant Green Sapphire Holdings, Inc. (the "Borrower"). Through a subsidiary, the Borrower owns real estate on the Caribbean island of St. Barthélemy (the "Properties").

Through the Alpha Carta Trust (the "Personal Trust"), Ritchie controls and manages assets for his own benefit. Through the Personal Trust, Ritchie controls third-party intervenor Alpha Carta, Ltd. ("Alpha"). Ritchie caused Alpha to fund the Borrower through a loan agreement containing facially non-market terms that qualify the investment as equity rather than debt.

Confronting a liquidity crisis that threatened his business empire, Ritchie turned to Robert Brownell, his longtime confidant and dealmaker. Ritchie asked Brownell to secure a bridge loan using the Properties as collateral.

Brownell developed terms for a short-term loan that he could present to accredited investors as part of a mini-syndication (the "Loan"). He created plaintiff Global Capital Partners LLC (the "Lender") as a special purpose vehicle to conduct the syndication and make the loan. The plan was for the Lender to raise capital from Brownell's network of investors, then use the capital to make the Loan to the Borrower. The principal security for the Loan would be the Properties. But the Borrower owned the Properties through a wholly owned subsidiary (the "Subsidiary"), and because enforcing mortgages on St. Barts is difficult, the Borrower also granted the Lender a security interest in the shares of the Subsidiary that it owned (the "Subsidiary Shares"). Having Brownell control the Lender benefited Ritchie, because it meant Ritchie's longtime confidant and trusted advisor would stand between Ritchie and the real lenders when it came time to enforce the Loan and potentially foreclose on the collateral.

Brownell's effort to raise money from his own network fizzled, so he turned to Tailwind Ltd., a fledgling private credit firm. Tailwind successfully shopped the loan to its stable of investors, but those investors did not want to fund an entity Brownell controlled. Rather than restructure the transaction, Brownell transferred control over the Lender to Tailwind. Its investors provided the funding, and the Lender made the Loan. Ritchie used the proceeds to pay off his most pressing debts.

Ritchie's team planned to repay the Loan using the proceeds from a separate sale of real estate, but Ritchie repurposed the proceeds at the last minute. The Borrower could not pay the Loan and defaulted.

To settle the debt, the Borrower agreed that the Lender owned the Subsidiary Shares and the Properties. The Lender also received a fee in the form of shares of stock in a different company.

Around the same time, Ritchie and Brownell had a falling out. Suspecting that Brownell had been double-crossing him for years, Ritchie commissioned an internal investigation into every deal Brownell touched, including the Loan. Ritchie's associates examined each transaction with jaundiced eyes. Working off a limited documentary record, they developed a narrative in which Brownell used the Loan to defraud Ritchie. They disputed the settlement and prevented the Lender from accessing the Properties.

The Lender filed this lawsuit to enforce the settlement. Believing it had obtained the Subsidiary Shares, the Lender caused the Subsidiary to sue as well. Ritchie caused Alpha to intervene and assert fraudulent transfer claims against the Borrower, which Ritchie himself controlled, and the Lender.

This post-trial opinion rules in favor of the Lender and the Subsidiary on their core breach of contract claim. The Lender owns the Subsidiary Shares, and the Subsidiary owns the Properties. The Borrower must stop interfering with the Lender's ownership and take all actions reasonably necessary to ensure that the Lender can control the Subsidiary Shares and the Properties.

3

This post-trial opinion rules against Alpha on all of its fraudulent transfer claims. Only a creditor can assert fraudulent transfer claims, and Alpha is not a bona fide creditor of the Borrower. Alpha is an equity investor that has tried to dress up its equity investments as loans. Alpha's claims are collusive, because Ritchie controls both Alpha and the Borrower. The claims would fail on the merits, but the court need not reach them.

The court awards the Lender damages of €3 million. The Lender is entitled to recover its expenses (including attorneys' fees) because of the Borrower's and Alpha's bad-faith litigation conduct. Alpha's loans to the Borrower are equitably subordinated to the Lender's recovery.

## I.     FACTUAL BACKGROUND

The facts are drawn from the post-trial record. Trial took place over three days. The parties introduced 449 exhibits and lodged depositions from eleven witnesses. Seven witnesses testified live. The parties agreed on just twenty-three stipulations of fact.[1] Having assessed the credibility of the witnesses and weighed the evidence as a whole, the court makes the following factual findings. The facts supporting the decree of specific performance rest on clear and convincing evidence. The facts as a whole rest on a preponderance of the evidence.

---

[1] Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX __ at __" refer to trial exhibits. Citations in the form "PTO ¶ __" refer to the Pre-Trial Stipulation and Order.

## A. A Preliminary Note On The Record And Credibility

The parties presented wildly divergent versions of events. Several factors make it difficult to discern what actually happened.

First, Ritchie is a key player in the dispute, yet he communicated almost exclusively through phone calls and ephemeral messages that left no discoverable written record. He also took pains to avoid appearing on documents. His affiliates' document preservation was at best inadequate and arguably sanctionable.[2] Those business practices reduced the quantum of contemporaneous records on which the court could rely.

Second, all parties are repeat players in international financial transactions where tax avoidance and regulatory anonymity are highly prized. They prioritized creating the appearances necessary to achieve those goals over accurately documenting what occurred. Those efforts undermined the reliability of the written records that do exist.

Third, one of Ritchie's entities refused to waive privilege over his former counsel's contemporaneous notes, even though two other Ritchie-controlled entities— Alpha and the Borrower—waived privilege.[3] Ritchie thus kept the notes out of the

---

[2] *See* Azzopardi Tr. 643 (Q: "[W]ere any steps taken by any of the entities for which you were a director to preserve evidence in the days after February 10 . . . ?" A: "We were meeting and trying to recall what happened, but, yeah, nothing specific.").

[3] *See* Cicoski Tr. 238–39. The court does not infer anything from the failure to waive privilege. *See* D.R.E. 512.

record with one hand, while creating the impression with the other that he wanted them available. Ritchie also declined to appear at trial, despite causing Alpha to intervene in his action. Those decisions left gaps in the factual record.

The court has therefore been forced to rely heavily on trial testimony. The witnesses who sought to support Ritchie's litigation narrative either lacked credibility or had limited personal knowledge. Garrett Vail's testimony fell short on both counts. He spun wide-ranging conspiracy theories, split hairs relentlessly, and refused to give straight answers. He also lacked contemporaneous personal knowledge and testified based on a suspicion-fueled, after-the-fact investigation he conducted into Brownell's dealings.

Paul Wolfe and Mark Azzopardi's testimony fell short for lack of personal knowledge. Wolfe knew some things, but he lacked information on key points. Azzopardi relied almost exclusively on a self-serving narrative that Ritchie gave him after his falling out with Brownell.

By contrast, two witnesses performed well. Dustin Springett, the founder of Tailwind and the Lender's representative, testified credibly and from personal knowledge about the actions he took on behalf of his firm and the Lender. Ryan Cicoski, a Delaware lawyer and the former general counsel of Ritchie's organization, testified credibly and from personal knowledge about the Loan, its origins, his interactions with Ritchie, and the case as a whole.

**B. The Family Office**

Ritchie is a wealthy former hedge fund principal turned private investor who now largely operates overseas.[4] Ritchie manages his personal investments through a network of interconnected trusts, holding companies, and other entities that make up his "Family Office."[5] Two of the top-tier entities in the Family Office are the Personal Trust and the Family Trust.

The trustee of the Personal Trust is Prairie Private Trust Company Ltd. (the "Personal Trustee").[6] In addition to holding ownership in various other entities, the Personal Trust is the sole owner of third-party intervenor Alpha.[7] Alpha holds a portfolio of primarily non-United States-based assets.[8]

---

[4] At one time, Ritchie's former hedge fund, the Chicago-based Ritchie Capital Management, had several billion dollars in assets under management. *See* Yuskus Tr. 646. Despite the court's urging, Ritchie refused to come to the United States for deposition or trial. *See* Dkt. 217; Dkt. 254 at 7–11. During his remote deposition, conducted via Zoom, Ritchie testified that he was a Cayman Islands resident and was "overseas," but his counsel instructed him not to provide any other information about his whereabouts. Ritchie Dep. 31–32.

[5] Ritchie and his associates use this term. *See* JX 292 ¶ 340 (referring to the entities owned or controlled by the Personal Trust, Alpha, the Family Trust, the Family Trustee, and their affiliates collectively as the "Family Office Trust Structure"); Azzopardi Tr. 572 (Alpha witness referring to the "Ritchie Family Office").

[6] Azzopardi Tr. 573; JX 196.

[7] PTO ¶ 44.

[8] *See* Cicoski Tr. 225.

7

The trustee of the Family Trust is NorthSea, LLC (the "Family Trustee").[9] The Family Trust is the sole owner of the Borrower, which holds a portfolio of primarily United States-based real estate investments.[10] Through a wholly owned subsidiary, Access Management, S.A.S. (the "Island Subsidiary"), the Borrower owned the Properties, comprising a villa, associated land, and a separate undeveloped parcel.[11] The Properties stand as an unexplained exception to the Family Trust's policy of holding United States-based properties.

The Family Office has centralized its accounting, administrative, legal, and other professional services functions within 60 Degrees Group SEZC, Ltd. (the "Back Office").[12] As a result, many Family Office entities have no employees.[13] The Back Office serves as the central nervous system for Ritchie's sprawling empire.

The following diagram depicts relevant aspects of the Family Office:

---

[9] PTO ¶ 49.

[10] *See* Cicoski Tr. 221. The Borrower was incorporated on December 13, 2006, under the name Organic Fuels Holdings, Inc. *See* PTO ¶ 43; JX 4; JX 8.

[11] PTO ¶ 34; JX 248 at 10.

[12] Cicoski Tr. 220. A third top-tier entity—the Prairie II Trust—controls the Back Office. That trust also controls another entity stack that is not relevant to this dispute. JX 196.

[13] Cicoski Tr. 220.



## C. Ritchie's Control

Ritchie exercises control over every entity in the Family Office.[14] Alpha and the Borrower dispute Ritchie's control, but the record establishes convincingly that the Family Office entities form a unified organization that Ritchie runs.[15] Key personnel at the Family Office, including Cicoski and then-CFO Stacey McHugh,

---

[14] Cicoski Tr. 295; *see Huizenga Managers Fund, LLC v. Ritchie*, Case No. 07-CH-9626, at 37 (Ill. Cir. Ct. Cook Cty. Jan. 27, 2015).

[15] Cicoski Tr. 226–27, 294–95; *see* Azzopardi Tr. 584, 586, 608 (testifying to uneasiness agreeing to anything as a director of Ritchie's entities without confirming Ritchie knew about it).

reported directly to Ritchie. Both regularly secured his "big thumbs-up"— sometimes just the literal emoji—before acting.[16]

Despite exercising actual control, Ritchie goes to great lengths to conceal his involvement. He operates "from the shadows" and maintains a tight grip on information.[17] Some trusted lieutenants work closely with him. Others remain at arm's length and depend on intermediaries for instructions.

Rather than holding organizational roles himself, Ritchie relies on a handful of longtime associates to serve in key positions. Wolfe, Vail, and Azzopardi are three of those associates. For a time, so were Cicoski and Brownell.

Wolfe is a trusted lieutenant who interacts directly with Ritchie. He has worked for Ritchie since 2001, having previously worked for Ritchie's father.[18] From January 2022 to November 2023, he served as a director of the Borrower.[19] After a brief absence, he rejoined the Borrower's board in February 2024, when he also

---

[16] Cicoski Tr. 296; *id.* at 226–27 (Q: "Were there any significant business decisions at Alpha Carta made without Thane Ritchie's approval?" A: "I can't think of any." Q: "How about for Green Sapphire?" A: "No. He would have been consulted, informed, advised, and more often an integral part of the process."). For example, McHugh communicated regularly with Ritchie to obtain approvals for payments from various entities in the Ritchie Family Office. *See* JX 59 (screenshot of messages between McHugh and "A" (i.e., Ritchie) seeking approval for payments); Wolfe Tr. 705 (testifying that seeking payment approvals in this format was "not unique"); JX 199 (text between McHugh, Wolfe, and Ritchie regarding payment approvals).

[17] Cicoski Tr. 229.

[18] Wolfe Tr. 676–78.

[19] *See* JX 20; Wolfe Tr. 680.

10

became a director of the Family Trustee.[20] At the time of trial, he simultaneously served as a director of the Borrower, a director of the Back Office, and a director of the Personal Trustee, which controls the Personal Trust and Alpha.[21] Wolfe thus embodied and could act contemporaneously on behalf of the entities on both sides of the purported dispute between the Borrower and Alpha.

Vail is another trusted lieutenant who interacts directly with Ritchie. A former lawyer, Vail has worked for Ritchie's entities since 2009, having previously represented Ritchie's entities in recovering money allegedly lost in a Ponzi scheme.[22] From around February 2024 through at least March 2025, Vail served as a director of Alpha. He was an Alpha director when Alpha intervened in this litigation, and he verified Alpha's third-party complaint.[23] Yet since February 2024, Vail has also been a director of the Borrower,[24] and at trial, he appeared as the Borrower's client representative.[25] Like Wolfe, he embodied and could act contemporaneously on behalf

---

[20] Wolfe Tr. 680, 702; Azzopardi Tr. 576.

[21] *See* Wolfe Tr. 698; Cicoski Tr. 279; JX 196. Plus Wolfe was an authorized signatory on Alpha's bank account. Wolfe Tr. 703.

[22] *See* Vail Tr. 721–24, 755.

[23] Dkt. 67; Vail Tr. 749–50.

[24] Vail Tr. 724, 726; JX 130 at 7.

[25] *See* Vail Tr. 751. Yet despite Vail's involvement with both the Borrower and Alpha, those entities claim they are not under common control. Vail even claimed at trial that the Borrower "has nothing to do with Mr. Ritchie." *Id.* at 756.

of the entities on both sides of the purported dispute between the Borrower and Alpha.

Azzopardi, by contrast, does not often interact directly with Ritchie and historically received information on a need-to-know basis. He has served as a director of various Family Office entities, including Alpha, for over ten years.[26] He has also periodically served as a consultant for the Family Office, receiving between €5,000 and €7,000 per month.[27] From approximately 2021 until 2025, he served as a director of the Family Trustee.[28] He remains a director of Alpha and the Personal Trustee.[29] A resident of Malta, he performs his duties at a distance, rarely travels across the Atlantic, and knows little about what the Family Office entities were actually doing.[30]

Cicoski interacted directly with Ritchie, but not to the same degree as Wolfe. In 2019, Ritchie hired Cicoski, previously a senior associate at a prominent Delaware

---

[26] Azzopardi Tr. 572–74, 620–21.

[27] *Id.* at 572–78.

[28] *Id.* at 573–74.

[29] *Id.* at 572–73; *see* JX 282 at 8 ("Thane [Ritchie] wants to use Mark [Azzopardi] as his surrogate on all global projects.").

[30] Azzopardi Tr. 582 ("I was frustrated at the time that I wasn't having enough contact," "sitting in Malta and taking on these roles," and "not having the ability to be on the ground and understand what everyone is doing all the time."); *id.* at 583–84 ("Malta is far away. With the technology it's easier today, obviously, but there's a time difference. I didn't travel that often across the Atlantic to be here. . . . I didn't have much contact with [Ritchie] during 2023 . . . . Thane was difficult to contact.").

12

law firm, as his general counsel.[31] Although the Back Office formally employed Cicoski, he provided legal services to the Family Office generally, including the Borrower, Alpha, and many other entities.[32] In August 2021, Cicoski became a director of the Borrower.[33] He also became a director of the Family Trustee and the Back Office.[34] He held those positions until he resigned in February 2024.[35]

Ritchie's "closest confidant" was Brownell, a long-time consultant and investment partner.[36] As Ritchie well knew, Brownell had served ten years in prison for conspiracy to commit mail and wire fraud.[37] After his discharge, Brownell and Ritchie worked closely together, with Brownell serving as Ritchie's go-to real estate advisor, dealmaker, and financial partner.[38] The pair were "inseparable" and often traveled and invested together.[39] Brownell regularly acted as a front man for Ritchie

---

[31] *See* Cicoski Tr. 219–20. Cicoski relocated to the Cayman Islands to perform his duties. *Id.* at 453.

[32] *See id.* at 221.

[33] JX 17.

[34] Cicoski Tr. 278–79.

[35] JX 101.

[36] Cicoski Tr. 243.

[37] *See id.* at 258, 389–92; Brownell Dep. 6. Brownell testified that his cellmate introduced him to Ritchie. *See id.* at 23.

[38] *See* Cicoski Tr. 243–44.

[39] *Id.* at 243 ("Robert visited with Mr. Ritchie—three times a month would not be unusual to have him flying out and them having hours of meetings. When they

by putting down deposits or making purchases, then obtaining reimbursement from the Family Office.[40] During their collaboration, Ritchie insisted that Brownell use an alias—Robert Bigelow—to invite fewer questions about his past.[41] But Ritchie and his associates all knew about Brownell's history.[42]

In addition to operating through surrogates, Ritchie strives to avoid creating any persistent record of his interactions.[43] He regularly communicated by phone or through ephemeral messaging applications like Telegram, Confide, and Signal.[44] He also insisted that his associates not keep written records. As Cicoski testified, "[I]f

---

went to look at properties, they'd go together. They'd go to different countries to look at properties, different states."); Brownell Dep. 26 ("I . . . was on [Ritchie's] private jet constantly going back and forth to Cabo where I would rent villas for him . . . .").

[40] Cicoski Tr. 324; Brownell Dep. 26.

[41] *See* Cicoski Tr. 391; Springett Tr. 22.

[42] *See* Cicoski Tr. 257, 391. The exception was Azzopardi, who discovered the truth much later and felt that others had kept him in the dark. Azzopardi Tr. 595–96.

[43] Cicoski Tr. 231 (testifying that Ritchie "did not like to put his name on legal documents, emails, anything . . . that could possibly come up in litigation down the road"); *id.* (explaining that Ritchie wanted "the ability to deny any action that his directors took in the future"); Brownell Dep. 23 (testifying that Ritchie "was adamant that he wanted his name on nothing, everything was to remain verbal"); *id.* at 18 (Ritchie "told me he wanted no record.").

[44] *See* Cicoski Tr. 228–29, 360, 433; Azzopardi Tr. 620. On the Confide platform, messages would self-destruct within thirty seconds. Cicoski Tr. 229. On other platforms, Ritchie set messages to automatically delete in twenty-four hours or less. *Id.* at 230. Ironically, the rapid auto-deletion forced Cicoski and other Ritchie associates to carry notepads and pens to keep track of Ritchie's multiple messages, despite Ritchie's instructions to the contrary. *Id.* at 229–30.

Mr. Ritchie had known I was taking notes or documenting those conversations, it would have been a bad afternoon for me."[45] Other employees and associates in the Family Office used email to communicate, but with the applications set to delete messages automatically after forty-five days.[46] When Cicoski recommended more practical document retention schedules, Ritchie refused.[47]

## D. The Liquidity Crisis

During the years leading up to this dispute, Ritchie often acquired illiquid assets that did not generate recurring revenue.[48] Ritchie regularly used leverage in his investment strategies, but without steady cash flow, Ritchie had to obtain loans from private capital providers who demanded high interest rates and tight covenants.[49]

In late 2022, as a result of those practices, the Family Office faced a "significant liquidity crunch."[50] Ritchie had failed to support a SPAC that he sponsored, fallen

---

[45] Cicoski Tr. 433.

[46] *See* JX 285; Azzopardi Tr. 643.

[47] Cicoski Tr. 393 (explaining that Ritchie "flat out refused" his records retention proposals); Azzopardi Tr. 591–92 (testifying about his "concerns about the corporate governance" in the Family Office because "there wasn't enough communication" and his attempts to "put in regular investment committees" were rejected).

[48] *See* JX 250; JX 251; Springett Tr. 30; Cicoski Tr. 251–52.

[49] Cicoski Tr. 251–52, 283.

[50] *Id.* at 232.

15

significantly behind in paying law firms handling key cases, missed payments for his private jet, and failed to pay employees and contractors.[51] As the Family Office's financial position deteriorated, its entities risked covenant defaults and other adverse loan events.[52]

The Borrower in particular faced the imminent maturity of millions of dollars in debt, including (1) approximately $4 million owed to Dominion Bank and secured by the receivables from a commercial real estate portfolio[53] and (2) approximately $3

---

[51] *Id.* The law firm bills were a serious problem. *Id.* at 232, 235; *see* JX 199 at 1 (Wolfe on November 11, 2022: "I know there is pressure from law firms to pay before year end."); *id.* at 2 (McHugh: "There are +150 legal invoices with some dating back to April 2021. I don't think firms care which invoice is paid at this point."). A seven-figure obligation to Winston & Strawn loomed large, because Winston was representing the Family Office in "incredibly contentious litigation" and had threatened it would withdraw for non-payment, which would have jeopardized Cicoski's ability to negotiate a global settlement. Cicoski Tr. 236.

The failure to pay employees was another major issue, and Brownell helped out by advancing money to Cicoski and other Family Office employees. *Id.* at 317, 321–22, 374–75; Brownell Dep. 12. At one point, Brownell helped Cicoski scout out residential properties in Pennsylvania. Cicoski Tr. 326–28. In this litigation, Alpha portrays Brownell's assistance as a successful effort to turn Cicoski against Ritchie, but the record—including Cicoski's credible testimony—proves otherwise. The assistance was part of Brownell efforts to help Ritchie, not a plot against him. *See id.* at 317, 321–22, 374–75.

[52] *Id.* at 232, 237–38.

[53] *See id.* at 232–33. At one point, Ritchie considered paying the Dominion loan by tapping a $4 million reserve earmarked for the Internal Revenue Service. *See* JX 28; McHugh Dep. 39–40. Ultimately, Ritchie decided against using the tax reserve. *See* JX 199. Alpha and the Borrower claim that the ability to use the tax reserve undercuts the claimed liquidity crisis. To the contrary, it shows that the crisis was sufficiently real that Ritchie was considering redeploying money earmarked for the United States Treasury. In addition, the tax reserve would not have addressed Ritchie's other impending obligations.

million owed to a hard money lender and secured by several different properties.[54] If the Borrower defaulted, it would lose the underlying collateral.[55] And the Borrower was not a cash-generating entity. Since 2017, it had operated at a loss,[56] with Ritchie funding its expenses through advances from Alpha.[57]

## E.    The Effort To Secure Bridge Financing

Cicoski and Wolfe, the Borrower's two directors, both knew about the Family Office's liquidity crisis. So did Ritchie and Azzopardi.[58] It was a daily topic of conversation within Ritchie's organization.[59] Ritchie and Wolfe planned to address the crisis by generating $11 million from selling Cayman Islands real estate known as the Calma Property, but that sale kept getting delayed.[60]

---

[54] Cicoski Tr. 234.

[55] *Id.* at 233–35.

[56] *See* JX 275 at 3; Yuskus Tr. 654. The Borrower booked positive net income in 2021, but that resulted from a write-up of investment value, not from cash income. Johnston Tr. 480.

[57] Yuskus Tr. 654–55; Johnston Tr. 478, 481. Sometimes Alpha paid the Borrower's creditors directly. *See* Yuskus Tr. 655; Johnston Tr. 481.

[58] *See* Cicoski Tr. 236–37; Azzopardi Tr. 621–22.

[59] Cicoski Tr. 238.

[60] *See id.* at 237; Wolfe Tr. 684, 699–700.

Ritchie therefore turned to Brownell, who had secured financing for Ritchie in the past.[61] Although Brownell ran point, Ritchie stayed heavily involved and spoke with Brownell frequently, often multiple times per day.[62]

With Ritchie's approval, Brownell worked with the Ritchie's longtime deal counsel, Charles Mack.[63] They envisioned using a special purpose vehicle to raise capital from investors in Brownell's network, then having the special purpose vehicle

---

[61] Sometimes, Brownell provided the loans himself. As late as summer 2022, Brownell had loaned several million dollars to the Family Office without documentation and with terms to be worked out in the future. *See* Cicoski Tr. 246; McHugh Dep. 42. On other occasions, he arranged financing from third parties. One loan—for approximately $1.5 million from Dallas Salazar—was coming due. *See* Cicoski Tr. 281; Mack Dep. 76.

[62] *See* Cicoski Tr. 249 ("He and Mr. Brownell would have worked through the economic terms on this particular loan, yes. And almost every other loan or transaction that I can think of, in my experience, they would have worked on the terms, the economic terms together."); *id.* at 243 ("In my measure, they spoke eight or nine times a day."); *id.* at 244 ("It was very well known that they had this type of relationship."); Brownell Dep. 26–27 ("I would speak with Thane Ritchie 365 days a year, Christmas, July 4th. It didn't matter. 6:00 in the morning until 11:00 at night. . . . So yeah, we spoke all the time, every day, seven days a week."); Wolfe Tr. 711 (Q: "And during Mr. Brownell's time with the Ritchie Family Office, he and Mr. Ritchie communicated regularly, didn't they? A: "I believe so.").

[63] Mack had represented Ritchie's entities on dozens of transactions, ranging from real estate deals and joint ventures to personal matters for Ritchie and his family. Mack Dep. 18. Mack had represented the Borrower on multiple occasions. *See* Cicoski Tr. 242; Mack Dep. 12–13. Tasking Brownell to handle a deal with counsel was not unusual. When raising capital secured by his overseas assets, Ritchie typically would consult with Wolfe, then speak with Brownell, then have Brownell and counsel carry out the plan. Cicoski Tr. 242 ("Thane [Ritchie] would speak to Paul [Wolfe] and speak to Robert [Brownell]. Robert would go out and try to execute on that plan, and he would be advised either by Mr. Mack or by one of our several other outside law firms . . . ."); *accord id.* at 244 ("Typically the way that it would work is that Thane would give the direction and Robert and Charlie would go out and try to execute.").

make the loan to the Borrower.[64] In September 2022, they formed the Lender for that purpose.[65]

Everyone understood that investors would only fund a loan to a distressed entity like the Borrower on an expedited basis if they received sufficient security and the loan carried an attractive interest rate.[66] Ritchie, Wolfe, and Brownell decided to use the Properties as collateral,[67] but the Properties were located in St. Barts, a jurisdiction governed by French law. Given the complexities of granting mortgages on the Properties themselves, they also planned to include the Subsidiary Shares as collateral. At the time, that meant the shares of the Island Subsidiary, which owned the Properties.[68]

---

[64] Cicoski Tr. 241 ("It would have been common knowledge. . . . I know that I had conversations at the time with all three of them [i.e., Ritchie, Wolfe, and Brownell], and everybody knew that the BNW, which is Robert's family office, the family office was going to be providing some sort of capital for us.").

[65] *See* PTO ¶ 41; JX 433. They originally formed the entity as a Delaware limited liability company with Brownell as the sole member. JX 26.

[66] *See* McHugh Dep. 40–41.

[67] *See* Cicoski Tr. 241.

[68] *See* JX 211 at 96. Internally, Family Office personnel referred to the deal as the "St. Barts loan." McHugh Dep. 40.

19

## F.     Cicoski Gets Involved.

In December 2022, Brownell retained a French lawyer to structure the loan in compliance with French law.[69] They sought to ensure that the Lender could foreclose on the Properties in the event of default.[70] The French lawyer advised that an authorized representative—like Cicoski—would need to sign documents for the Borrower.[71]

---

[69] Brownell used his alias when interacting with the lawyer and signed the engagement letter on the Borrower's behalf as "Robert Bigelow." JX 31.

[70] JX 32 at 13–17; *see* JX 211 at 96 (discussing "Right to foreclose" with Salazar, who was considering funding a portion of the loan at the time but later backed out); Springett Tr. 31 ("To get investors to pull money from their other positions for a four-month—for a 120-day loan, a good rate of return—risk-adjusted rate of return had to be offered."). In this litigation, Alpha and the Borrower claim that Brownell was acting on his own to accomplish a "loan-to-own" scheme so he could get the Properties for himself. They point out that Brownell controlled the Lender, was trying to ensure that the Lender could secure the Properties in the event of default, and wanted an attractive rate of return. Those facts are true, but not the spin. Brownell was trying to structure a deal that investors would fund, and no one would fund the Loan unless it provided an attractive rate of return and the Lender had the ability to obtain the Properties in the event of default. Brownell controlled the Lender at that point because he was acting as a loan syndicator and arranger to set up the transaction. If he had remained in control of the Lender, that would have benefited Ritchie, because it would mean that Ritchie's longtime friend and confidant would be in a gatekeeping position at the Lender for purposes of enforcement (somewhat analogous to a bond trustee). As events transpired, Tailwind's investors correctly perceived Brownell's involvement with the Lender as a risk for them—not Ritchie—and insisted on Springett controlling the Lender. The idea that Brownell was double-crossing Ritchie when setting up the Loan is a conspiracy theory that Ritchie and his team invented after Ritchie and Brownell had their falling out.

[71] JX 32 at 1.

Cicoski knew that Brownell and Mack were working on a loan, but his main job was managing litigation, so he had not been closely involved.[72]

In early January 2023, Ritchie and Wolfe gave Cicoski clear instructions: "Robert Brownell's family office is going to loan the money or arrange a loan. We are not concerned with the terms of the loan. Just get it done."[73] Cicoski complied.[74]

Brownell pitched the loan to his investor network, but he could not assemble the necessary financing.[75] Several factors made the transaction tough to execute. One was the short time frame. Another was Ritchie's reputation for litigiousness, which

_____

[72] Cicoski Tr. 219–20, 241, 251. Ritchie typically relied on outside legal counsel for transactional matters. *Id.* at 241–42.

[73] *Id.* at 237; *see* JX 68 (Cicoski to McHugh on January 2, 2023: "In brief, the situation is this. Thane understands the need for short-term funding, wants me to put together whatever is necessary to accomplish that in the next 24-36 hours, and will work on the details with Robert this weekend."). Based on Cicoski's testimony, it appears the instructions came either through encrypted messages or "conversations" or both. *See* Cicoski Tr. 237–38.

[74] Mack took contemporaneous handwritten notes of a meeting with Brownell and others involved in the fundraising effort on January 3, 2023. JX 211 at 80. The group discussed the loan structure, the plan that the Lender would get the Properties in the event of default, and the fact that Cicoski was joining the team. *Id.* ("loan would be paid by [the Brownell family office] and [it would] own the real estate"). Cicoski was not personally present at the meeting, but someone reported that Cicoski was "willing to cooperate." *Id.* Alpha and the Borrower claim that means Cicoski would be complicit in Brownell's supposed "loan-to-own" scheme. The credible evidence shows that Cicoski was willing to cooperate as general counsel to the Family Office by taking on a lot of work to complete the Loan on a compressed timetable, even though it would distract him from his principal duties. *See* Cicoski Tr. 247–48 (describing assistance with negotiating non-economic deal terms).

[75] Some investors passed outright. Two investors, including Salazar, initially expressed interest, but they backed out. *See* JX 458 at 2.

21

made some investors nervous. A third was the location of the Properties in a foreign jurisdiction, which raised questions about the security.[76]

## G. Tailwind Gets Involved.

Brownell turned next to Nathan Smith, a former Family Office CFO with connections in the Caribbean private loan industry.[77] Smith contacted a friend at Tailwind, then a fledgling private lender based in the Cayman Islands that specializes in private credit. Smith's contact put him in touch with Springett, Tailwind's founder. Other than knowing who Smith was, Springett had no prior connections to Smith, Brownell, or Ritchie.[78]

Smith asked Springett to fund the transaction that Brownell and Mack had designed. Springett understood that the Borrower needed $10 million on short notice to pay off near-term debts. The Borrower would repay the loan plus 10% interest in a lump sum in 120 days. The security would be the Properties and the Subsidiary Shares.[79]

---

[76] *See* Cicoski Tr. 245.

[77] *See* Smith Dep. 9; Springett Tr. 34–35.

[78] Springett Tr. 19, 23. Springett initially knew Brownell as Bigelow. Over the course of the transaction, Springett learned Brownell's real name. *See* Springett Tr. 23.

[79] *Id.* at 18–19, 24–25; JX 458.

Springett conducted some due diligence primarily focused on the security.[80] As part of that effort, the Borrower provided an appraisal that valued the Properties well above the loan amount, and although Tailwind's internal appraisal suggested a lower value, Springett thought the purchase price for the Properties showed the security would be sufficient.[81] The Borrower also provided several years of financial statements reflecting substantial assets, although most were illiquid.[82] Tailwind also reviewed financial statements from Brownell's family office, which would guarantee the loan, and confirmed that "they also had plenty of assets."[83]

Tailwind's outside counsel assisted with due diligence and reviewed the Ritchie entities' corporate documents.[84] Tailwind also conducted "Know Your Customer" checks on the entity stack that owned the Properties—including the Island Subsidiary, the Borrower, and the Family Trustee.[85]

---

[80] Springett Tr. 28.

[81] *Id.* at 25–26; *see* JX 459 at 6.

[82] Springett Tr. 29–30; JX 250; JX 251.

[83] Springett Tr. 28–29. Brownell's family office also received an option to purchase the Loan if the Borrower defaulted. *Id.* at 66, 123; JX 459 at 5. That was not a big deal. It was the functional equivalent of the right to subrogation against a borrower that arises whenever a guarantor repays a loan, but it would enable the guarantor to enforce the Loan directly rather than indirectly.

[84] Springett Tr. 29.

[85] *Id.* Tailwind did not check the ultimate beneficiaries of the Family Trust because it received "confirmation that no beneficiary had more than 20 percent ownership in the trust." *Id.* at 28; *see* JX 364. The Family Trust has only four beneficiaries—Ritchie's wife and three children—so that is mathematically

23

Springett viewed the terms as appropriate given the need to raise the money on short notice and the risk associated with collateral in a foreign jurisdiction.[86] He testified credibly that stepping in to fund a pre-packaged loan was not uncommon in his business, and that Tailwind often does deals on short notice if the terms are satisfactory.[87]

Tailwind does not have committed capital that it can deploy itself. Instead, like Brownell, Tailwind has a pool of investors that it contacts on a deal-by-deal basis.[88] Springett presented the opportunity to his network, and Smith looked for other possible investors.[89]

---

impossible. Alpha and the Borrower argue that Cicoski made a false representation to Tailwind to avoid having to inform Ritchie's wife and children about the Loan, but the record does not support that theory. Cicoski testified credibly that he made the representation based on the advice of the Family Trust's counsel and because Ritchie "did not want to disclose who the ultimate beneficial owners were." Cicoski Tr. 341–50. If the blame falls anywhere, it lies with the Family Trust's trust counsel and Ritchie.

[86] *See* Springett Tr. 41–42 ("So this was a short-term deal with assets in a foreign jurisdiction, in a different language, and the rate had already kind of been established. . . . This rate is not that unusual.").

[87] Springett Tr. 40–41. Alpha and the Borrower argue that Springett should have done more due diligence and uncovered Brownell's criminal conviction. They suggest Springett went light on due diligence because the deal was too good to be true. In reality, Springett was presented with a tight timeline and had to make a business decision about how much due diligence to conduct. He made a reasonable decision. But even if he did not, that failure might give rise to potential claims by Tailwind's investors. It would not give the Borrower grounds to escape the Loan.

[88] *Id.* at 15–17.

[89] *See* JX 456 at 6–7; Springett Tr. 143–44.

24

## H. The Loan Authorization

Meanwhile, the lawyers turned drafts of the loan documents and consulted with experts on French law.[90] As part of the loan documentation, Tailwind asked its outside counsel to opine on the enforceability of the loan documents.[91] To give the opinion, outside counsel needed a resolution from the Borrower authorizing the transaction.[92] On January 29, 2023, Cicoski and Azzopardi executed a written consent from the Family Trustee, which controlled the Family Trust, the Borrower's sole stockholder, acting in their capacity as the only directors of the Family Trustee (the "Initial Consent"). They also authorized a guarantee from the Family Trust.[93] Ritchie and Wolfe knew about the Loan and the consent.[94]

After hearing from his investors, Springett told Brownell that they needed to modify the loan documents. The original plan envisioned a two-step transaction in which Tailwind's special purpose vehicle would loan money to the Lender, which would extend the Loan to the Borrower. Springett's investors did not want a

---

[90] *Id.* at 34; Cicoski Tr. 248–49; JX 40.

[91] Springett Tr. 148–49; JX 248 at 8, 12.

[92] Springett Tr. 176.

[93] *See* JX 33; JX 34; Azzopardi Tr. 621–22; Cicoski Tr. 262.

[94] Cicoski Tr. 264–65. At trial, Wolfe disclaimed contemporaneous knowledge of the Loan and claimed he would not have approved it. *See* Wolfe Tr. 681 ("Had it been shared with anybody else other than Brownell, who had suckered [Cicoski] into the situation, it would have been immediately called out that this is a horrendous deal and improper."); *accord id.* 682–86. Wolfe's testimony on these points was not credible; Cicoski's was. *See* Cicoski Tr. 264–65.

25

middleman; they wanted to loan directly to the Borrower.[95] Brownell understood their position, and the parties could have redrafted the loan documents to provide for a loan from Tailwind's entity to the Borrower. But time was short, and the lawyers had documented the Loan from the Lender to the Borrower.[96] As a timesaver, Brownell assigned all member interests in the Lender to Tailwind's vehicle, and Springett became the Lender's manager.[97] After the assignment, Brownell had no ownership interest in or control over the Lender.[98]

## I.    The Loan Closes.

On February 2, 2023, the Borrower and the Lender executed a Loan and Security Agreement (the "Loan Agreement").[99] Cicoski signed the Loan Agreement for the Borrower as its director.[100] The Loan Agreement tracked the terms Brownell

---

[95] Springett Tr. 36.

[96] *Id.* at 32–33. Redoing the paperwork would have required several days, including because some documents needed translating to or from French. *Id.*

[97] JX 35. Brownell received no consideration for the assignment. Alpha and the Borrower see the lack of compensation as suspicious, but it reinforces the reality that Brownell was acting on behalf of Ritchie to facilitate an expedited loan. He transferred the entity freely because he was trying to help his friend get a deal done.

[98] Springett Tr. 38–39.

[99] JX 248. Even before signing, because of the Borrower's urgent need for funds, one of Smith's investors transferred $900,000 to Mack's IOLTA account on January 31, 2023. Springett Tr. 55, 173; JX 39; JX 164 at 33. On McHugh's instructions, Mack wired $225,555.56 to a hard money lender to pay a loan extension fee for the Borrower, then wired the remaining $674,444.44 to Alpha. JX 38; *see* Cicoski Tr. 281–82, 424.

[100] JX 248 at 39.

and Mack had worked out in advance. The Loan consisted of a $10,000,000 advance to the Borrower, with repayment in full plus ten percent interest due in 120 days (i.e., on June 2, 2023).[101] The Loan was secured by "all of Borrower's right, title and interest in and to" the shares of stock of the Island Subsidiary,[102] plus a commitment by the Borrower to cause the Island Subsidiary to grant a mortgage or other security interest in the Properties within thirty days.[103]

The Borrower also committed to "cause [the Island Subsidiary] to change its domicile to Florida, United States of America prior to granting the mortgages on the Properties."[104] Springett viewed that commitment as a key business term.[105] The reason is obvious: it meant the situs of the shares would be in the United States and readily subject to an enforcement action in a United States court.

The Borrower executed a promissory note and pledge agreement in connection with the Loan.[106] Separately, the Borrower agreed to pay $700,000 of the proceeds to

---

[101] *Id.* §§ 2.1–2.3.

[102] *Id.* §§ 1.1, 3.1.

[103] *Id.* § 3.5 ("Within thirty (30) days of the date of this Agreement, the Borrower shall have such first lien mortgage properly recorded or registered in the records of St. Barthelemy and provide a copy of such recorded or mortgage and any attestations or affirmations as may be reasonably required by Lender affirming the first lien position of the mortgage on the [Properties] and due and proper execution of all related documents.").

[104] *Id.* § 5.3.

[105] Springett Tr. 51–52.

[106] JX 44; JX 45.

Tailwind as an underwriting fee and another $100,000 as an "Agency" fee.[107] In a side letter, the Borrower agreed to pay Brownell $2.6 million in syndication and underwriting fees.[108] The Lender was not a party to the side deal with Brownell, and Springett knew nothing about it until this litigation.[109]

## J.      The Florida Subsidiary And The First Modification

On February 3, 2023, Mack filed a certificate of domestication and articles of incorporation, signed by Cicoski, to domesticate the Island Subsidiary in Florida under the name Access Management S.A.S. Inc. (the "Florida Subsidiary").[110] Meanwhile, Tailwind reported a delay in securing the $10 million and asked to modify

---

[107] JX 397 at 2–3; JX 228; Springett Tr. 128.

[108] JX 397 at 2–3.

[109] Springett Tr. 137. Alpha and the Borrower point to the high fees as an indication that Brownell was using the Loan to line his own pockets at Ritchie's expense. The fee to Brownell is high, but the record shows that Brownell was involved in many transactions with Ritchie, and they moved money around through many channels. They easily could have used those fees as one path to repay some amount that Ritchie owed Brownell. In any case, the side payment to Brownell would not affect the Loan, because Springett and Tailwind had no involvement with it. Plus, the Borrower never paid any fees to Brownell. *See* JX 397 at 2–3.

[110] JX 47; JX 57. Because the parties dispute whether the Island Subsidiary and the Florida Subsidiary are distinct, this decision strives to refer to the appropriate version and to use the term "Subsidiary" where a distinction is not warranted. The term "Subsidiary Shares" refers to the shares the Borrower posted as collateral for the Loan, no matter where the Subsidiary is domiciled. This decision ultimately finds that the Borrower committed to domesticate the Island Subsidiary in Florida such that it is now the Florida Subsidiary.

the documents to reflect that development.[111] Tailwind also asked for confirmation that Cicoski could sign the modification for the Borrower.[112]

On February 15, 2023, Cicoski and Azzopardi executed a second written consent as the sole directors of the Family Trustee that caused the Family Trust—in its capacity as the Borrower's sole stockholder—to ratify all of the actions the Borrower had taken (the "Ratifying Consent").[113] There was arguably ambiguity in the language of the Initial Consent as to whether both Cicoski and Azzopardi had to sign the Loan or whether either of them could act alone, and the Ratifying Consent sought to eliminate any concerns about the Borrower's authority to enter into the Loan and related documents.[114] The Ratifying Consent expressly empowered Cicoski to act alone and authorized the Florida domestication.[115]

The next day, the Lender and Borrower entered into a First Amendment to the Loan Agreement (the "First Modification"). It addressed the funding delay, extended the maturity date by two weeks, and reflected the Island Subsidiary's domestication in Florida as the Florida Subsidiary.[116] The Lender fully funded the second tranche

---

[111] Cicoski Tr. 280–81; *see* JX 458 at 1.

[112] *See* Cicoski Tr. 271–72.

[113] JX 49 at 1–2; Azzopardi Tr. 623–24.

[114] Cicoski Tr. 272, 383–84.

[115] JX 49.

[116] JX 50.

promptly after the First Modification.[117] On February 17, Tailwind's outside counsel wired the net proceeds of $8,849,910 on the Lender's behalf to Mack's IOLTA account.[118] Mack wired $7.1 million to Alpha and approximately $1.5 million to Brownell's family office to repay an earlier loan Brownell had secured for the Borrower.[119] The remaining $240,000 paid for legal fees and Tailwind's transaction fee.[120]

---

[117] Springett ended up sourcing the investors who provided $6.5 million of the $10 million loan, with Smith sourcing the investors who provided the rest. Springett Tr. 143–44, 181. They worked out a side deal that paid Springett a portion of Tailwind's underwriting fee. JX 228; JX 229; Springett Tr. 165 (testifying that a fee-sharing arrangement like Tailwind and Smith negotiated was "pretty normal in the business").

[118] JX 54; JX 165; Springett Tr. 56–57. The transfer reflected the full $10 million loan, less the $900,000 pre-signing payment and approximately $250,000 in transaction fees. Mack Dep. 45.

[119] JX 55; JX 56; Cicoski Tr. 281–82; Mack Dep. 76.

[120] JX 55. The following table breaks down the disbursements:

| | | |
|---|---|---|
| **Advance (January 31, 2023)** | **$ 900,000.00** | |
| Loan Extension Payment | | $ 225,555.56 |
| Alpha | | $ 674,444.44 |
| **Withheld For Lender Transaction Fees** | **$ 250,090.00** | |
| **Remaining Proceeds (February 17, 2023)** | **$ 8,849,910.00** | |
| Alpha | | $7,100,000.00 |
| Brownell Family Office / Salazar Loan | | $1,510,006.00 |
| Additional Tailwind Fees | | $ 139,914.00 |
| Tailwind Counsel Legal Fees | | $ 68,490.00 |
| Mack Legal Fees | | $ 31,500.00 |
| **Total Loan Proceeds** | **$10,000,000.00** | |

Alpha transferred at least $3.65 million of the loan proceeds to the Borrower's bank account.[121] The Borrower used the funds to pay Dominion Bank.[122] The Borrower also benefited from the loan payoff that went through Brownell. The Back Office used the rest of the funds to pay overdue bills from law firms, contractors, and other vendors.[123] The Borrower recorded a debt of $8 million on its books.[124]

McHugh and Cicoski kept Ritchie and Wolfe updated on the flow of funds.[125] "Everyone wanted to know when these funds came in. It was a signal day for us when they did."[126]

---

[121] *See* Johnston Tr. 512; JX 60. Vail testified at trial that "money was never delivered to Green Sapphire" and that "Global Capital never actually delivered money to anybody." Vail Tr. 730–31. Those statements were false. Even Vail admitted that Tailwind's counsel delivered funds to Mack. *See id.* at 731–32. And neither Vail nor Wolfe could deny that the Borrower received a benefit from the Loan. *See* Wolfe Tr. 708–09; Vail Tr. 732–33. The Borrower's general ledger and credible testimony from plaintiffs' forensic accounting expert confirm that the Borrower not only benefited from the Loan but received a portion of the proceeds in its bank account. JX 164 at 7; Johnston Tr. 512–17; *see also* Cicoski Tr. 281–82.

[122] JX 164 at 7; *see* Wolfe Tr. 708–09 (admitting that "ultimately, yes, Green Sapphire enjoyed a benefit of 3.6 to 4 million in the retirement of the debt with Dominion").

[123] Cicoski Tr. 281–82.

[124] JX 164 at 33; Johnston Tr. 510.

[125] Cicoski Tr. 282.

[126] *Id.*

## K.     The Extension

When the Loan came due on June 16, 2023, the Borrower failed to pay. Neither the Borrower nor Ritchie had the money.[127] The Calma Property sale remained in limbo, and other funding sources had not panned out.[128] When the Borrower asked for an extension, Springett and his investors agreed.[129] They were not happy, but they preferred not to go through the expense and burden of a foreclosure proceeding.[130]

On June 16, 2023, the Borrower, the Lender, and the guarantors into a Second Loan Modification and Ratification Agreement (the "Second Modification").[131] It extended the Loan maturity date to October 31, 2023, and deferred payment of $1 million in past due interest to September 1, 2023. In return, Lender advanced an additional $1 million.[132]

The modification came with significant fees. The Lender received a $500,000 "Modification Fee" due at maturity, a monthly $250,000 "Maintenance Fee" starting in July 2023 and continuing until full repayment, and a $350,000 "Second

---

[127] *Id.* at 283.

[128] *See id.* at 283–85; JX 211 at 14–23.

[129] *See* JX 69 at 2.

[130] Springett Tr. 46–47, 59.

[131] JX 71. Alpha and the Borrower claim that Ritchie knew nothing about the Second Modification. Cicoski testified credibly otherwise. Cicoski Tr. 294–97. Plus Alpha produced an executed version of the Second Modification from its files, so Alpha had it. *See* JX 71 (showing Alpha Bates number); Yuskus Tr. 663–64.

[132] JX 71 at 3.

Underwriting Fee."[133] Brownell was to receive a $500,000 "Guaranty Fee" for continuing to guarantee the Loan, but he never got it.[134] The Borrower also paid the Lender's legal fees.[135]

The additional $1 million advance went to pay past due fees from the original Loan and a portion of the additional fees: $525,000 covered overdue Tailwind's underwriting and agency fees and a portion of the Second Underwriting Fee; $250,000 covered the first Maintenance Fee; and $105,000 covered the Lender's legal fees.[136] The remaining $120,000 went to Mack's IOLTA account for the Borrower's benefit.[137]

As Springett acknowledged, those fees were high. But Tailwind and its investors had provided a distressed entity with funds on short notice that it otherwise could not obtain, and the Borrower had now shown that it could not repay in accordance with the original terms. The fees compensated the Lender for the additional risk of the extension, and the Maintenance Fee was designed to incentivize

---

[133] *Id.* at 4.

[134] *Id.*

[135] *Id.*

[136] JX 79 at 3; Springett Tr. 63–65. The Borrower had only paid $350,000 of Tailwind's original underwriting fee. JX 397 at 2–3. It still owed Tailwind $450,000 to cover the remainder of its original underwriting and agency fees. *Id.*; Springett Tr. 65. Brownell had not been paid any fees he was supposed to receive, and he did not receive any money from the Second Modification. *See* JX 397 at 2–3. Separately, Tailwind and Brownell extended the option to acquire the loan. JX 474.

[137] JX 79 at 3; JX 80.

33

prompt repayment.[138] Cicoski did not like the deal but believed the alternatives were worse. He thought that if the Lender foreclosed, it could create another liquidity crisis.[139]

## L.    Ritchie Creates Greater Dysfunction.

During 2023, Ritchie grew increasingly difficult and unpredictable.[140] Cicoski, McHugh, and Azzopardi had tried to improve the Family Office's internal processes and governance, but they met with little success.[141] Instead, Ritchie terminated McHugh and replaced her with Tim Yuskus, a longtime employee who had worked for Ritchie in support roles since 2003.[142] Around the same time, Ritchie stopped paying his team, including Cicoski and Azzopardi.[143] Azzopardi was fed up and decided to resign.[144]

---

[138] Springett Tr. 63–65, 122.

[139] *See* Cicoski Tr. 290–91.

[140] *Id.* at 253.

[141] *See* JX 78 at 3 ("If this organization is going to continue—we have to focus and cut projects until 1 or more turns cash flowing . . . . We have 15+ projects over the world. All great opportunities. But we don't have the resources (people and cash) to support[.]"); Azzopardi Tr. 624–26.

[142] Cicoski Tr. 254–55; Yuskus Tr. 645–50.

[143] Cicoski Tr. 355, 358; Azzopardi Tr. 599–601; JX 367; JX 348.

[144] Azzopardi Tr. 627–28; Cicoski Tr. 254–255 (Azzopardi was resigning in part because "Thane had reneged on a contractual commitment [Cicoski] made to him."); JX 349.

The closing of the Calma Property sale created a moment of hope.[145] Ritchie's team had earmarked those funds to repay the Loan, but Ritchie transferred them elsewhere.[146] The Family Office faced another liquidity crisis.[147]

## M. The Borrower Defaults.

When the extended Loan matured again on October 31, 2023, the Borrower could not repay it. Cicoski had to decide between taking a hard line and forcing the Lender to sue or working out a compromise. As Cicoski explained at trial, he believed the latter option was the better choice:

> I felt an obligation to honor a contract that I had signed, as bad as it was, and I didn't believe that it was right to have the lender chase us all over the earth, spend years in litigation—I had already seen that too many times with this organization and the destruction that it caused. . . . We did not have the money. We could not repay it. We were in default. They had the right to foreclose. I wanted to prevent that. I thought the assets were worth much more than what we currently could do. I just did not think the nuclear option of litigation at that point was viable.[148]

He therefore tried to negotiate a settlement.[149]

---

[145] Cicoski Tr. 291.

[146] *Id.*; Wolfe Tr. 685.

[147] Cicoski Tr. 291–92.

[148] *Id.* at 293–94.

[149] *Id.* at 302–03.

Springett also preferred a settlement.[150] But he was not sure Ritchie could be trusted given his failure to pay a second time.[151] Brownell's family office likewise had not come through on its guarantee, nor had it taken out Tailwind by purchasing the Loan.[152] The Tailwind investors wanted their money back.[153]

After weeks of negotiation over a standstill agreement, the Lender sent the Borrower a notice of default on December 12, 2023.[154] The notice gave the Borrower twenty-four hours to accept the Lender's standstill agreement or the Lender would foreclose.[155]

When the Borrower failed to agree, the Lender seized the Subsidiary Shares on December 15, 2023, then acted by written consent to remove Cicoski and make Springett its sole director.[156] Cicoski continued to negotiate. With the Borrower

---

[150] Springett Tr. 46, 68–69.

[151] *Id.* at 61.

[152] *Id.* at 66–67.

[153] *See* JX 486.

[154] JX 89. During this time, Tailwind explored what a foreclosure sale would involve. Springett Tr. 27. As part of that process, Springett learned that the original appraiser's figures had been altered and that the value of the Properties was "way lower" than the Borrower's initial appraisal, though still adequate to cover the loan. *Id.* at 27–28; *see* JX 243; JX 245.

[155] JX 89 at 2.

[156] JX 90; JX 91; JX 92. The Lender's "biggest concern" was preserving its collateral. Springett Tr. 75–76 ("[W]e had already seen that Thane Ritchie could go in the bank account and take stuff, take money from it. So this put us in protect your collateral.").

lacking any near-term ability to repay the Loan, Cicoski sought to stop interest and fees from accruing and avoid costly litigation.[157]

On February 7, 2024, the Borrower and Lender entered into a Loan Settlement Agreement (the "Settlement Agreement").[158] Cicoski signed it for the Borrower, and Brownell for the guarantor.[159]

The Lender understood the Settlement Agreement to confirm that it had acquired ownership of the Florida Subsidiary and the Properties.[160] The Settlement Agreement also provided for the Borrower to pay a $335,000 fee to Tailwind plus a "Lender Settlement Fee" of $1,665,000 "to settle any and all claims Lender may have under the Loan Documents."[161] The Borrower committed to pay these fees using shares of stock in a company called Proton Green, rather than in cash.

On February 9, 2024, the parties signed an amendment to the Settlement Agreement. The amendment included a provision stating that, "Borrower relinquishes any residual rights or claims it may have to the Subsidiary Shares to Lender."[162]

---

[157] Cicoski Tr. 440–41.

[158] JX 94.

[159] *Id.* at 7.

[160] Springett Tr. 76–77.

[161] JX 94 at 2–3.

[162] JX 95 at 2.

## N.     Things Fall Apart.

To help Ritchie with his financial crisis, Brownell had not only structured the Loan. He had also loaned Ritchie millions of dollars of his own money. Ritchie never paid any of it back, and tensions grew between them.[163]

On February 7, 2024, Brownell's lawyers severed his ties with Ritchie, the Family Trust, and its affiliates.[164] He also informed Ritchie that he would not be providing any additional financial support.[165]

Brownell's line in the sand put Ritchie in a bind. He had relied on Brownell for years, not only for money but also as a dealmaker. Two days later, Ritchie fired back, writing:

> 60 Degrees [i.e., the Back Office] continues to weigh the damages caused by your clients' behavior. However, we specifically point your attention to the fact that the Brownell Parties, as recently as four days ago, represented to 60 Degrees that they were continuing to lead a number

---

[163] Cicoski Tr. 254 ("[T]here was also the strain that the [Brownell] Family Office had lent Mr. Ritchie millions and millions of dollars, and, in fact, in December of '23 would lend another million dollars to Mr. Ritchie to pay a significant IRS portion of what was to be settled. So even in late '23 he was dropping off checks for a million dollars, but to the best of my understanding, those monies were not repaid. . . . And Robert's family I think had put a lot of pressure on him to recover some of the sums that were due.").

[164] JX 279. Brownell also may have become uncomfortable with some of Ritchie's new associates and recent behavior. *See* Cicoski Tr. 254 ("And, frankly, [Ritchie] had started to surround himself with people who were not people that I was comfortable with and I think that Robert, in particular, was uncomfortable with. . . . And I suspect that Robert also had learned what I learned in the February, March time frame about what happened at the house in Driftwood that Thane used to live at, which is what precipitated my own resignation."); *see also id.* at 260–61.

[165] JX 279.

of important transactions involving sales and monetization of certain 60 Degrees' assets (the "**60 Degrees Transactions**").

Your client's abrupt and unilateral termination of its relationship with 60 Degrees, without reasonable notice or any effort whatsoever to transition their roles leading the 60 Degrees Transactions, has jeopardized the viability of these transactions. In short, 60 Degrees has been left scrambling to understand the status of the 60 Degrees Transactions to ensure that they, despite your clients' reckless and damaging behavior, close these transactions without incurring further damages.[166]

Those transactions included selling property in Texas. According to Wolfe, Brownell told Ritchie that the property would sell for $96 million.[167] After Brownell cut ties, Ritchie learned the property had sold for around $40 million.[168]

These events caused Ritchie to suspect that Brownell had defrauded him, and he ordered Vail to dig into every transaction that Brownell had touched.[169] Fueled (at a minimum) by resentment born of circumstance, Ritchie, Vail, and Wolfe constructed a narrative in which Brownell had been double-crossing Ritchie for years. They decided that Brownell had paid off Cicoski to participate in the conspiracy and that the Loan was another example of Brownell's disloyalty.

On February 10, 2024, Ritchie called Azzopardi and told him that Brownell and Cicoski had been conspiring against him for over a year. Azzopardi had approved

---

[166] JX 280 (formatting modified).

[167] Wolfe Tr. 713.

[168] *Id.*; Vail Tr. 725.

[169] Vail Tr. 725–27.

some of their actions as a director, including the Loan. Ritchie berated Azzopardi for his involvement and blamed him for the results.

Azzopardi was shocked.[170] Ritchie always kept him at arms' length, and Azzopardi had relied on Cicoski for information about what Ritchie wanted. Azzopardi had never doubted Cicoski.[171] Now, Ritchie was telling him something very different and accusing him of wrongdoing.

But Azzopardi had his own beef with Ritchie over money, and Azzopardi had resigned from his positions in Ritchie's organization because Ritchie had not paid him.[172] Then, on February 14, a €15,000 payment from Ritchie appeared in Azzopardi's bank account.[173] The bank halted the payment as suspicious and asked for documentation. After checking with Ritchie's team, Azzopardi sent the bank his old consulting agreement, even though it was no longer operative, and the bank released the payment.[174]

With the money issue addressed, Wolfe stepped in to get Azzopardi back on Ritchie's side. Ritchie and Wolfe's bad-cop/good-cop tactics worked. Azzopardi blamed

---

[170] Azzopardi Tr. 586.

[171] *Id.* at 582–83 (Q: "At the time that you're describing that you're in communication with Mr. Cicoski, did you have any reason to distrust what he was telling you?" A: "No, not at all. In fact, like I said, I considered him as a breath of fresh air.").

[172] *Id.* at 586–87, 614, 627.

[173] *Id.* at 634–35, 638; JX 282.

[174] Azzopardi Tr. 638; JX 282; JX 356.

himself for facilitating Brownell and Cicoski's supposedly insidious actions, writing Wolfe: "I'm in a deep dark hole. I'm afraid I might do something to harm myself."[175] After telling him not to do anything harmful, Wolfe offered a way out, writing: "Thane is remarkably forgiving where there is contrition . . . [a]nd willingness to help[.]"[176]

Ritchie and Wolfe convinced Azzopardi to support their conspiracy theories. Azzopardi agreed to do "everything [he] could to help establish a case" and handed over all of his communications with Cicoski and Brownell.[177] He never spoke with Cicoski, despite Cicoski's attempts to reach him. He simply "took Thane's word for it."[178]

## O.    Cicoski Resigns.

As the Family Office became more dysfunctional, Cicoski was preparing to resign.[179] Shortly after executing the Settlement Agreement, he learned about of

---

[175] JX 357 at 3.

[176] Ritchie and Wolfe played two other cards to bring Azzopardi over to their side. They stressed that Cicoski had received significantly more money than Azzopardi, which Azzopardi resented (even though Cicoski was performing full-time work, and Ritchie had not paid Cicoski in months). *See* Azzopardi Tr. 600–05; JX 36. They also capitalized on Azzopardi's faith by comparing Brownell to "Lucifer" and telling Azzopardi, "This is not just a legal battle[.] . . . It is at its heart a spiritual battle[.]" JX 357 at 4.

[177] Azzopardi Tr. 634.

[178] *Id.* at 619. At trial Azzopardi testified that "at the time [he] thought [Ritchie] was being told" about the Loan, but that he has now come to "understand" otherwise. *Id.* at 615, 619. His "understanding" came from Ritchie.

[179] Cicoski Tr. 399; JX 101.

events at a Texas property held through an entity where Cicoski served as the sole

manager:

> I got a note in February or March from the tenant there. I was the—like I had explained earlier, I'm the sole manager of this entity and it holds a house in Driftwood, Texas where Thane used to live. We were renting it out to a former NFL offensive lineman and his family. Apparently, they had not paid the rent. I think they missed maybe one rent payment. So someone sent four people to the house. They assaulted the tenant's daughter, they trespassed on the property. The police were called.
>
> And I got a call from the tenant and he said, "Did you send these people?" And I said, "No, but I'm the sole director." So this is a problem. And so he was pressing charges. I just had a feeling who it was who had done this.
>
> And then a few weeks later I got a notice that there was a raid by the ATF on the property and they pulled eight tons of ammo and 13 high-caliber weapons, something like that, and they were all seized from the property. And the search warrant was in Mr. Ritchie's name. I was already resigning at that point, and when I got notified that that had happened, it sort of sped up my resignation, shall we say.[180]

On February 27, 2024, Cicoski formally resigned from all positions in the Family

Office.[181] Wolfe and Vail became the Borrower's directors.

## P.    The Attempted Renovations

Meanwhile, the Lender planned to sell the Properties to recoup its losses and

repay its investors. Springett decided to renovate the villa first and hired an

architect.[182] Because the villa sits on environmentally sensitive land, securing a

---

[180] Cicoski. Tr. 255–56.

[181] JX 101.

[182] Springett Tr. 84–85.

building permit is difficult, but the Borrower had an existing permit from July 2020.[183]

In April 2024, Springett applied to transfer the building permit to the "Access Management S.A.S. Ltd."[184] That name corresponds neither to the old Island Subsidiary nor to its post-domestication incarnation as the Florida Subsidiary. Springett intended to transfer the property to the Florida Subsidiary, but he made a mistake.[185] The local authority granted the application.

But when the Lender and Florida Subsidiary tried to take possession of the Properties and start renovations, the Borrower filed suit in Guadeloupe claiming that the initial transfer of the Properties in 2022 was invalid (the "Guadeloupe Civil Action").[186] Next, the Borrower filed a criminal complaint with the Guadeloupe public prosecutor charging that the Loan resulted from fraud.[187] Vail filed a supporting affidavit in which he held himself out as a practicing lawyer (he had not practiced since 2013) and averred that the complaint's allegations resulted from a forensic

---

[183] JX 15; *see* Springett Tr. 101.

[184] JX 115.

[185] Springett Tr. 160–61; *see* Fornacciari Tr. 217 (Plaintiffs' French law expert: "For me, there was no doubt that the application was made by Mr. Springett for Access Management S.A.S., Inc. [i.e., the Florida Subsidiary]."). Alpha claims that the application transferred the permit to the Island Subsidiary, but the entity name on the application did not match its name either. Plus that entity no longer existed. It had domesticated in Florida as the Florida Subsidiary.

[186] JX 117; JX 116; Springett Tr. 92–93.

[187] JX 133; JX 132.

examination (he has no forensic qualifications).[188] Although the Guadeloupe prosecutor did not pursue the claims, the Borrower sent the complaint to the St. Barts local authorities and claimed to be "facing serious, malicious attempts by third parties to illegally appropriate its immovable properties."[189]

The Lender tried to move forward with the renovations, and construction began in July 2024. But in August 2024, the Borrower exercised self-help by changing the locks on the property entrance and sending the architect cease-and-desist letters.[190] Construction came to a halt.[191]

## Q. This Litigation

On August 22, 2024, the Lender and the Florida Subsidiary filed this lawsuit against the Borrower. They asserted claims for breach of contract, defamation, tortious interference with contract, and tortious interference with business expectancy. The Borrower moved to dismiss the plaintiffs' complaint in its entirety.

On September 12, 2024, the Borrower purported to change the name of the Island Subsidiary to Vue Mer Signature Holdings and to appoint Vail as its chairman.[192] The Borrower claimed that Island Subsidiary still existed as a distinct

---

[188] JX 130; *see* Vail Tr. 736–39.

[189] JX 136; *see* Springett Tr. 98–99.

[190] JX 157 at 3–5; Springett Tr. 90–91.

[191] Springett Tr. 90–91; JX 157; *see also* JX 148.

[192] JX 258.

entity and that the domestication to Florida was ineffective.[193] On December 11, the Borrower dismissed the Guadeloupe Civil Action on the theory that it had regained control of the Island Subsidiary, which supposedly owned the Properties.[194]

The Lender responded by filing an application in a St. Barts court for the equivalent of a *lis pendens*. The St. Barts court denied the application, citing a forum selection clause in the Loan selecting the courts of Delaware. The Lender then moved in this court for a status quo order and expedited proceedings.[195] The Lender was justifiably concerned that the Borrower was trying to deprive the Lender of its collateral and wanted to move quickly before the existing building permit expired. On February 6, 2025, the court granted the Borrower's motion to dismiss the defamation and tortious interference claims, denied the motion to dismiss the breach of contract claim, granted expedition, and issued a status quo order.[196] The court later entered a scheduling order contemplating a two-day trial starting June 9, 2025.[197]

On March 12, 2025, Alpha moved to intervene as a third-party plaintiff. The Borrower supported Alpha's intervention, claiming that "[t]here is no basis for Plaintiffs' assertion that Alpha Carta and Green Sapphire are affiliates with common

---

[193] *See id.*; Springett Tr. 99–100.

[194] JX 150 at 13.

[195] Dkt. 13; Dkt. 15.

[196] *See* Dkt. 27.

[197] Dkt. 32.

owners" and representing that "Thane Ritchie does not control the Petro Carta Trust (Green Sapphire's sole stockholder)."[198] Those statements were false. Not yet understanding the true relationship between Alpha and the Borrower, the court granted intervention.

Alpha then filed a third-party complaint asserting eight counts, including fraudulent transfer and breach of contract.[199] Vail verified the complaint on behalf of Alpha. Vail was simultaneously a director of the Borrower. One of the allegations in Alpha's verified complaint asserted that Alpha had demanded that the Borrower repay a loan. In fact, Alpha had never demanded repayment, so that averment was false.[200]

The Borrower and Alpha obstructed discovery and failed to meet deadlines. In response to a motion to compel, the court appointed a special discovery magistrate.[201] She reported that the Borrower's "conduct reflected an overall lack of transparency and inability to follow through on its commitments to the other parties, let alone meet discovery deadlines."[202]

---

[198] Dkt. 65 at 4.

[199] Dkt. 67.

[200] *See* Yuskus Tr. 660; Azzopardi Tr. 610.

[201] Dkt. 88; Dkt. 112.

[202] Dkt. 288 at 3.

The Borrower also stopped paying its counsel. The court allowed counsel to withdraw and required substitute counsel to appear by May 16, 2025, or the court would find the Borrower in default.[203] On May 14, rather than hire new Delaware counsel, the Borrower filed for bankruptcy in the United States Bankruptcy Court for the Northern District of Illinois, automatically staying this litigation. That was a tactical choice, because despite suing the Borrower, Alpha continued to advance hundreds of thousands of dollars of funds to the Borrower, and some of that money could have been used to pay counsel.[204]

Between May 23 and June 3, 2025, with Wolfe's authorization, Yuskus modified hundreds of entries in the Borrower's general ledger.[205] He changed entries related to Alpha's advances from "accounts payable" to "notes payable."[206] He also added new entries for "accrued interest payable to Alpha Carta" for 2018 to 2025.[207] Yuskus claimed to be unaware of any loan agreement with Alpha before early 2025 and asserted he was merely trying to document the loan relationship.[208]

---

[203] Dkt. 105.

[204] *See* JX 164 at 4; Yuskus Tr. 661, 663.

[205] *See* JX 169 at 24–25; Johnston Tr. 497–500; Wolfe Tr. 710–11.

[206] JX 169 at 24–25; Johnston Tr. 500; Yuskus Tr. 659.

[207] Yuskus Tr. 659; Johnston Tr. 500.

[208] Yuskus Tr. 658–59.

The Lender and the Florida Subsidiary sought relief from the automatic stay to pursue this action. The bankruptcy court granted their request.[209]

On July 1, 2025, the court entered a stipulated scheduling order providing for trial at the end of August.[210] The next day, the Borrower removed the case to the United States District Court for the District of Delaware, claiming this action was "related to" the bankruptcy proceeding.[211] The district court remanded the case a day later.[212]

The Borrower continued to resist discovery, leading to a second motion to compel.[213] The court set a deadline for any opposition.[214] Rather than responding, the Borrower filed a *second* notice of removal based on the same grounds as the first.[215] The district court promptly remanded the case again.[216]

On August 5, 2025, the plaintiffs moved to compel Ritchie's in-person deposition. The court granted the plaintiffs' motion and ordered Ritchie to appear

---

[209] Dkt. 118.

[210] Dkt. 134.

[211] Dkt. 139, Ex. at 5.

[212] Dkt. 154.

[213] *See* Dkt. 167; Dkt. 180.

[214] Dkt. 169.

[215] Dkt. 171.

[216] Dkt. 192.

within 48 hours. Ritchie's counsel represented that he was outside the United States and would not come to the United States for deposition or trial.[217] He gave his deposition by Zoom.

Trial took place on August 20–22, 2025. Ritchie did not attend.

In an earlier lawsuit, a judge in the Circuit Court of Cook County, Illinois, offered the following comment on Ritchie's litigation conduct: "My not-so-brief time overseeing this case tells me that Mr. Ritchie, through his various companies and through his counsel . . . attempted to do nothing short of sowing anarchy in the civil justice system."[218] The court's experience has been much the same.

## II.    THE NON-MERITS DEFENSES

The Borrower seeks to achieve a non-merits victory by raising a series of pre-emptive defenses: lack of subject matter jurisdiction, failure to name an indispensable party, and lack of personal jurisdiction.

## A.    The Lack Of Subject Matter Jurisdiction Defense

The Borrower's first non-merits defense contends that the court lacks subject matter jurisdiction. The Lender asserted a claim for breach of contract, with equitable jurisdiction grounded on its pleading-stage request for injunctive relief and current request for specific performance. The Borrower says those requests "came far too late

---

[217] *See* Dkt. 254 at 4, 6.

[218] *Ritchie Multi-Strategies Glob., LLC v. Huizenga Managers Fund, LLC*, Case. No. 18-CH-6001, at 57–58 (Ill. Cir. Ct. Cook Cty. Aug. 26, 2019) (TRANSCRIPT) (JX 7).

procedurally" and cannot support jurisdiction because a declaration of breach plus an award of money damages would provide complete relief.[219] Contrary to the Borrower's contention, the court can exercise subject matter jurisdiction over this dispute.

The Court of Chancery possesses limited subject matter jurisdiction. The court "can acquire subject matter jurisdiction in the first instance by three different means: (1) the invocation of an equitable right; (2) a request for an equitable remedy when there is no adequate remedy at law; or (3) a statutory delegation of subject matter jurisdiction."[220] "The party seeking the Court's intervention bears the burden of establishing jurisdiction."[221]

A party can challenge the court's subject matter jurisdiction at any point in the proceeding.[222] A court generally determines whether it has subject matter jurisdiction by looking at the face of the complaint and accepting the allegations as true.[223] But when evaluating whether subject matter jurisdiction exists based on a request for

---

[219] Dkt. 277 at 9.

[220] *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 973 (Del. Ch. 2016) (internal quotation marks omitted).

[221] *Shore Invs., Inc. v. BHole, Inc.*, 2009 WL 2217744, at *2 (Del. Ch. July 14, 2009).

[222] *See Imbragulio v. Unemployment Ins. Appeals Bd.*, 223 A.3d 875, 878 (Del. 2019) ("A litigant may raise a court's lack of subject matter jurisdiction at any time in the same civil litigation, even initially at the highest appellate instance." (cleaned up)).

[223] *Diebold Comput. Leasing, Inc. v. Com. Credit Corp.*, 267 A.2d 586, 590 (Del. 1970).

equitable remedies, the court "must look beyond the remedies nominally being sought, and focus upon the allegations of the complaint in light of what the plaintiff really seeks to gain by bringing his or her claim."[224] That means "a judge in equity will take a practical view of the complaint, and will not permit a suit to be brought in Chancery where a complete legal remedy otherwise exists but where the plaintiff has prayed for some type of traditional equitable relief as a kind of formulaic 'open sesame' to the Court of Chancery."[225] This court will not exercise subject matter jurisdiction when a remedy at law "will afford the plaintiffs full, fair and complete relief,"[226] meaning it will be as "complete, practical and efficient" as equitable relief.[227]

Here, the Borrower maintains that the Lender only sought damages for its breach of contract claim, asserts that "[s]pecific performance is mentioned nowhere in the Complaint," and argues that equitable relief is unnecessary.[228] The Borrower reads the complaint too narrowly. Among other relief, plaintiffs' complaint sought a

---

[224] *Candlewood Timber Gp., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 997 (Del. 2004).

[225] *Int'l Bus. Machs. Corp. v. Comdisco, Inc.*, 602 A.2d 74, 78 (Del. Ch. 1991); *see* 10 *Del. C.* § 342 ("The Court of Chancery shall not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State."); *El Paso Nat. Gas Co. v. TransAmerican Nat. Gas Corp.*, 669 A.2d 36, 39 (Del. 1995) (same).

[226] *Hughes Tool Co. v. Fawcett Publ'ns, Inc.*, 315 A.2d 577, 579 (Del. 1974).

[227] *Int'l Bus. Machs.*, 602 A.2d at 85.

[228] Dkt. 277 at 4.

judgment "[p]reliminarily and permanently enjoining [the Borrower] from taking any action to interfere with [the Lender's] ownership of [the Florida Subsidiary] and the [Properties]."[229]

"A request for injunctive relief clearly constitutes equitable relief over which this Court has jurisdiction,"[230] as long as the request is "bona fide."[231] Here, the request was bona fide. The Borrower refused to recognize the Lender's rights to either the Properties or the Subsidiary Shares. The Borrower changed the locks on the Properties, sent cease-and-desist letters to the architect, filed legal proceedings in Guadeloupe, and created confusion over which manifestation of the Subsidiary—the Island Subsidiary or the Florida Subsidiary—continued to exist or whether they were distinct entities. The Lender legitimately requested equitable relief to stop the Borrower from evading its obligations and complicating the factual landscape. The Lender also legitimately sought equitable relief to force the Borrower to comply with its obligations and undo the mess it had created.

The Borrower objects to the Lender's reliance on its request for injunctive relief because the Borrower links that request to the Lender's claim for tortious interference, which the court dismissed. The Borrower seems to have fixated on the

---

[229] Dkt. 1 at 23.

[230] *Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917, at *2 (Del. Ch. Nov. 5, 2004); *see Cont'l Auto. Sys., Inc. v. Nokia Corp.*, 2023 WL 1370523, at *21 (Del. Ch. Jan. 31, 2023).

[231] *DBMP LLC v. Del. Claims Processing Facility, LLC*, 2025 WL 3013006, at *8 (Del. Ch. Oct. 24, 2025).

request for an injunction against "interference" and assumed that linguistically, that word must relate to the claim for tortious interference. But the request for relief was not limited to that count. The Lender sued for breach of the Settlement Agreement and sought equitable relief to force the Borrower to comply with its terms. The Borrower had interfered with the Lender's rights in the colloquial sense, and the Lender wanted injunctive relief that would stop the Borrower from interfering and force the Borrower to comply.

The Borrower's fixation on the complaint's failure to use the explicit words "specific performance" is also misguided. Nothing in the Court of Chancery Rules requires that a party plead specific performance as a remedy, and the court determines the appropriate remedy after a party prevails, not at the pleading stage.[232] Just as pleading certain "magic words" like "injunction" or "specific performance" does not automatically open the door to the Court of Chancery,[233] the

---

[232] *See, e.g., Delawareans for Educ. Opportunity v. Carney*, 199 A.3d 109, 178 (Del. Ch. 2018) (declining to rule on remedies at the pleading stage, writing that "[w]hether and what kind of remedy issues should be addressed at a future date"); *Bear Stearns Mortg. Funding Tr. 2006-SL1 v. EMC Mortg. LLC*, 2015 WL 139731, at *17 (Del. Ch. Jan. 12, 2015) ("At the pleadings stage, the court will not rule out the possibility of other remedies, such as rescissory damages.").

[233] *McMahon v. New Castle Assocs.*, 532 A.2d 601, 603 (Del. Ch. 1987) (Allen, C.) ("Chancery jurisdiction is not conferred by the incantation of magic words. . . . If a realistic evaluation leads to the conclusion that an adequate remedy is available this court . . . will not accept jurisdiction over the matter."); *accord Cochran v. F.H. Smith Co.*, 174 A. 119, 121 (Del. Ch. 1934) (Wolcott, C.) ("It appears sometimes to be thought that if fraud be present in any situation the *open sesame* has been found upon the pronouncing of which the doors of equity are flung wide apart. That is a misconception.").

failure to use talismanic remedial phrases does not prevent the court from exercising jurisdiction when the complaint supports the potential need for an equitable remedy.[234] Here, in addition to specific items of relief, the complaint requests "such other and further relief as the Court deems just and proper."[235] To the extent a linguistic remedial hook is necessary (a dubious pleading proposition), that phrase "could encompass, in an appropriate case, an award of specific performance."[236] The complaint's allegations provide ample basis to believe a decree of specific performance could be warranted, making this "an appropriate case."

---

[234] *See Carpenter v. Liberty Mut. Ins. Co.*, 2023 WL 3454692, at *3 (Del. Ch. May 15, 2023) (noting that the complaint did not contain a request for specific performance, but dismissing complaint for lack of jurisdiction because the complaint failed to support an inference that specific performance would be needed, not because the complaint did not contain those words); *Ravenswood Inv. Co., L.P. v. Est. of Winmill*, 2018 WL 1410860, at *2 (Del. Ch. Mar. 21, 2018) (declining to exercise subject matter jurisdiction where the plaintiff both did not expressly seek specific performance and had not otherwise "attempted to demonstrate that the remedy is appropriate"), *aff'd*, 210 A.3d 705 (Del. 2019).

[235] Dkt. 1 at 23.

[236] *Ravenswood*, 2018 WL 1410860, at *24; *see, e.g., Sheet Metal Workers' Int'l Ass'n Loc. 19 v. Herre Bros., Inc.*, 201 F.3d 231, 249 (3d Cir. 1999) ("In its amended complaint, the Union requested money damages representing lost wages and fringe benefits, a declaratory judgment, and such other relief as the Court deems just and reasonable. . . . As a result, we believe that the request for relief in the amended complaint is broad enough to encompass a request for specific performance, especially in light of the actual request made in a post-trial brief." (alteration and internal quotation marks omitted)); *Int'l Union of Elevator Constructors, AFL–CIO v. Reg'l Elevator Co.*, 847 F. Supp. 2d 691, 701 (D. Del. 2012) ("Because Plaintiffs' Complaint did request that the Court grant other such relief deemed just and proper, Plaintiffs' claim for specific performance is appropriately raised." (alteration and internal quotation marks omitted)).

If the Lender sprang the specific performance remedy on the Borrower at the last minute, then concern for due process could counsel against recognizing it as a basis for jurisdiction.[237] But this case does not involve the type of extreme facts that would warrant that outcome. Here, it has long been clear that specific performance was on the table.

Finally, this is not a case where a declaration of breach plus an award of money damages could provide an adequate remedy. Telling the Lender that it could only recover a money judgment would effectively deprive the Lender of the security it obtained and turn the Lender into an unsecured creditor. The Lender bargained for

---

[237] *See Ravenswood*, 2018 WL 1410860, at *25 (refusing to consider awarding specific performance in light of "[p]laintiff's basic failure meaningfully to address the remedy question at any stage of these proceedings," which "created a vacuum that the Court cannot fill, even in the spirit of equity, without offending fundamental notions of due process").

the ability to foreclose on real estate,[238] a unique asset,[239] or on the shares of an entity that owned unique real estate assets.[240]

## B. The Indispensable Party Argument

The Borrower next argues that the court cannot grant relief involving the Properties because the Island Subsidiary is an indispensable party under Rule 19. It is not.

Rule 19 treats a party as indispensable if

(A) in that person's absence, the Court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

---

[238] The Borrower provided two forms of security for the Loan: (1) a security interest in the shares of the Island Subsidiary (initially) and the Florida Subsidiary (subsequently) and (2) a commitment to provide mortgages on the Properties themselves. The Borrower provided the first type of security because of the difficulties in perfecting mortgages under French law in time for the Loan to close. The real security for the Loan is the Properties.

[239] *See Osborn v. Kemp*, 991 A.2d 1153, 1162 (Del. 2010) ("We recognize that real property is unique and often the law cannot adequately remedy a party's refusal to honor a real property contract."); *Szambelak v. Tsipouras*, 2007 WL 4179315, at *7 (Del. Ch. Nov. 19, 2007) ("Real property is unique; thus, specific performance of a real estate sale contract is often the only adequate remedy for a breach by the seller, except in rare circumstances.").

[240] *See True N. Commc'ns Inc. v. Publicis S.A.*, 711 A.2d 34, 45 (Del. Ch. 1997) (explaining that opportunity to acquire entity was unique opportunity that rendered money damages inadequate); *accord ACE Ltd. v. Cap. Re Corp.*, 747 A.2d 95, 110 (Del. Ch. 1999) (noting that "the loss of a unique acquisition opportunity may constitute an irreparable injury" that renders monetary damage inadequate (internal quotation marks omitted)).

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.[241]

If an indispensable party cannot be joined, then a court must determine how to proceed. The court need not undertake that inquiry, because the Island Subsidiary is not an indispensable party.

For starters, the Island Subsidiary no longer exists. Under Florida law, a domesticated foreign corporation is "[t]he same corporation, without interruption, as the domesticating corporation."[242] In addition, "[a]ll real property and other property owned by the domesticating corporation . . . are the property and contract rights of the domesticated corporation without transfer, reversion, or impairment."[243] In this case, the Borrower committed to "cause [the Island Subsidiary] to change its domicile to Florida, United States of America" before granting the mortgages that secured the Loan.[244] In compliance with that obligation, the Borrower redomiciled the Island Subsidiary in Florida, resulting in the Island Subsidiary becoming the Florida Subsidiary. There is no longer an Island Subsidiary that could be a party to the case. The only extant entity is the Florida Subsidiary, which is a plaintiff.

---

[241] Ct. Ch. R. 19(a).

[242] Fla. Stat. § 607.11924(1)(f)(1).

[243] *Id*. § 607.11924(1)(a).

[244] JX 248 § 5.3.

57

The Borrower contends that the Island Subsidiary continues to exist and that it has changed its name to Vue Mer Signature Holdings. The fact that the Borrower made a false filing on a foreign corporate registry that changed the name of an already domesticated corporation does not change the fact that the domestication took place. It reflects a clerical error.

Assuming for purposes of analysis that the domestication was not effective, then the present state of affairs results from the Borrower's failure to comply with its domestication obligation under the Loan and breach of the Settlement Agreement. "Equity regards as done what ought to have been done."[245] That principle creates an equity in favor of a party entitled to performance when the counterparty fails to perform and then invokes its own failure as a defense to its obligations.[246]

---

[245] *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1030 (Del. Ch. 2020) (refusing to allow defendants to take advantage of their failure to take contractually mandated action as a way to avoid the contractual obligation).

[246] *See Freeman v. Fabiniak,* 1985 WL 11583, at *8 (Del. Ch. Aug. 15, 1985) ("Because equity regards as done that which ought to be done, a contract for sale of land, chattels, or choses in action acts as an equitable conversion. . . . Therefore, once Atlantic Financial exercised its option on March 8, 1985, the equitable ownership of the shares passed to it. The shares could not thereafter be voted hostile to the interests of Atlantic Financial."); *Eddington v. Turner*, 26 A.2d 80, 82 (Del. Ch. 1942) (explaining principle). The principle resembles the prevention doctrine, under which a party cannot avoid performing by relying on the failure of a condition that the party itself caused to fail. *Compare Phillips Petroleum Co. v. Arco Alaska, Inc.*, 1986 WL 7612, at *14 (Del. Ch. July 9, 1986) (relying on equitable maxim and holding that "[t]o permit SAE to circumvent a Data Cutoff Agreement that would otherwise be applicable by allowing it to rely upon the non-occurrence of a procedural formality that SAE itself deliberately chose to preclude, would be unconscionable"), *with Mobile Commc'ns Corp. of Am. v. MCI Commc'ns Corp*, 1985 WL 11574, at *4 (Del. Ch. Aug. 27, 1985) (explaining that under the prevention doctrine, "a party may not escape

Matters do not get better for the Borrower without the equitable maxim. The Island Subsidiary is not indispensable under Rule 19(a)(1)(A) because the court can "accord complete relief among existing parties."[247] The court can order the Borrower to transfer all of its shares in the Island Subsidiary to the Lender. If necessary, the court can appoint a receiver to take control over the Borrower and effectuate the transfer.

The Island Subsidiary is also not indispensable under Rule 19(a)(1)(B), because resolving this action without the Island Subsidiary as a party would neither "impair or impede [its] ability to protect the interest" nor "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of [the Island Subsidiary's] interest."[248] For purposes of the first issue, the Borrower can and has adequately represented any interests the Island Subsidiary might have. Both seek to escape from the Loan and the Settlement Agreement. The Borrower claims to control the Island Subsidiary. The latter cannot do anything without the former.

For purposes of the second issue, the only parties with competing claims to the Borrower's Subsidiary Shares are the Lender, the Borrower, and Alpha. This decision

---

contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent").

[247] Ct. Ch. R. 19(a)(1)(A).

[248] Ct. Ch. R. 19(a)(1)(B).

adjudicates those claims. The Borrower has not identified any risk of inconsistent obligations that it or the Island Subsidiary might face.

The indispensable party argument fails.

## C. The No-Jurisdiction-Over-The-Properties Defense

In a variant of its indispensable-parties argument, the Borrower contends that the court cannot grant relief because it lacks jurisdiction over the Properties. The Borrower argues that a court applying French law with jurisdiction over the Properties must determine the validity of any effort to transfer an interest in the Properties and that this court must defer to the outcome of that as-yet-unfiled proceeding. That mashup of concepts fuses together arguments typically framed under the guise of choice of law, *forum non conveniens*, and general principles of comity.

Those preliminary issues do not limit a court's ability to address the merits once it has jurisdiction over the parties. A court can apply foreign law. A court can order a party before it to take action, including in a foreign jurisdiction. While a court can and should hesitate before awarding impractical or futile remedies, how to proceed is a discretionary determination.[249]

Here, the court has subject matter jurisdiction over the case and personal jurisdiction over the Borrower, which is a Delaware corporation. The court can order the Borrower to take action to remedy its breach, including actions relating to the

---

[249] *See 26 Cap. Acq. Corp. v. Tiger Resort Asia Ltd.*, 309 A.3d 434, 465–74 (Del. Ch. 2023).

Properties. If those actions require that the Borrower act through a subsidiary, the court can decree that as well. The court can also appoint a receiver to carry out its orders. This is not the rare case like *26 Capital*, where unique concerns about illegality and influence led the court to decline to order specific performance concerning an asset halfway around the world. Even then, the court did not throw up its hands and dismiss the case, as the Borrower proposes. The court entertained alternative relief.[250]

The fact that the Properties are not within this court's jurisdiction does not defeat the Lender's claims.

## III.    THE MERITS

The Lender sought at trial to prove its claim for breach of the Settlement Agreement. "The elements of a claim for breach of contract are (i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance."[251] The Lender proved each element.

---

[250] *Id.* at 474 ("This ruling does not mean that 26 Capital will not be entitled to any remedy. To the extent 26 Capital has proven a breach of contract and Universal has not proven any of its affirmative defenses, then 26 Capital may be able to recover damages.").

[251] *AB Stable VIII LLC v. MAPS Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

61

## A. The Settlement Agreement Is A Valid And Enforceable Contract.

The first issue is whether the Settlement Agreement constitutes a valid and enforceable contract. A valid contract exists "when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration."[252] Here, a threshold issue looms: whether Cicoski had authority to bind the Borrower.

### 1. Authority

The Borrower claims that Cicoski lacked authority to enter into the Settlement Agreement. The Borrower also argues that Cicoski lacked authority to enter into the Loan, which retroactively eliminates any basis for Cicoski to have entered into the Settlement Agreement.[253] Cicoski possessed actual authority to do both as the Borrower's duly empowered agent.[254]

"An individual corporate director may negotiate a settlement on behalf of the corporation—and bind the corporation to an agreed-upon settlement—provided the

---

[252] *Osborn*, 991 A.2d at 1158.

[253] This is a *Terminator* argument. Just as Skynet sought to negate John Connor's imminent victory by sending the Terminator back in time to assassinate his mother and prevent John's birth, so too the Borrower seeks to negate the Settlement Agreement by reaching back in time to invalidate the Loan. *See The Terminator* (Hemdale Film Corporation 1984).

[254] The plaintiffs rely in the alternative on the doctrine of apparent authority. The court does not reach that issue.

director has actual or apparent authority to do so."[255] "An agent possesses 'actual authority' when it has been expressly or implicitly granted authority by a principal."[256] "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."[257] An agent's actual authority goes beyond the principal's words to encompass the actions "designated or implied in the principal's manifestations to the agent and acts necessary or incidental to achieving the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives when the agent determines how to act."[258] The principal's manifestations "may be made directly by the principal to the agent or may reach the agent through a more circuitous route."[259]

---

[255] *Sarissa Cap. Domestic Fund LP v. Innoviva, Inc.*, 2017 WL 6209597, at \*16 (Del. Ch. Dec. 8, 2017); *see Parke Bancorp Inc. v. 659 Chestnut LLC*, 217 A.3d 701, 712 (Del. 2019) ("Under the common law of agency, there are two main forms of authority: actual authority and apparent authority.").

[256] *Caribbean Sun Airlines Inc. v. Halevi Enters. LLC*, 339 A.3d 24, 35 (Del. 2025).

[257] *Harmon v. Del. Harness Racing Comm'n*, 62 A.3d 1198, 1201 (Del. 2013) (quoting Restatement (Third) of Agency § 2.01 (2006)).

[258] Restatement (Third) of Agency § 2.02(1); *accord Sarissa*, 2017 WL 6209597, at \*17.

[259] Restatement (Third) of Agency § 3.01 cmt. b.

In *Sarissa*, the Court of Chancery held that a director had actual authority to bind the corporation to a settlement agreement based on the board of directors' manifestations of authority and the director's reasonable understanding of those manifestations.[260] The board had appointed the director to act as the corporation's "lead negotiator" in settlement discussions with the counterparty, instructed the director "to see if a settlement agreement . . . could be reached," and told the director to convey key terms for a settlement.[261] Time was of the essence, because the other side was likely to lose its incentive to settle if the corporation delayed.[262] Under the circumstances, the director "reasonably understood the Board's (and thus [the corporation's]) manifestations" as empowering him to enter into an oral settlement agreement.[263]

### a. The Manifestations

The manifestations regarding Ritchie's authority in this case gave him actual authority to enter into the Settlement Agreement. When Cicoski approved the Settlement Agreement, Cicoski was the general counsel of the Family Office. He was also the Borrower's sole director. In those capacities, he was an agent of the Family Office, which operated as the central nervous system for Ritchie's entities. He was

---

[260] *Sarissa*, 2017 WL 6209597, at *17.

[261] *Id.*

[262] *Id.* at *18.

[263] *Id.*

also an agent of Ritchie, the ultimate principal for each entity in the Family Office. Those roles gave Cicoski all the actual authority he needed.

The circumstances surrounding both the Loan and the Settlement Agreement further manifested Ritchie's authority. Facing a liquidity crisis, Ritchie instructed Cicoski to help Brownell secure the Loan. Ritchie and Wolfe, one of Ritchie's close associates, told Cicoski to get the Loan closed.[264] Ritchie was personally involved,[265] and the Loan was a regular topic of conversation as a short-term solution to the Family Office's cash flow problems.[266] Cicoski reasonably believed that Ritchie had empowered him to enter into the Loan.

Cicoski also reasonably believed that he had actual authority to execute the Loan because of the written consent that he and Azzopardi executed on January 29, 2023, as the only directors of the Family Trustee. The Family Trustee controlled the Family Trust, which was the Borrower's sole stockholder. The written consent expressly authorized Cicoski to execute the Loan Agreement.[267] A subsequent consent ratified the Loan and authorized the First Modification, the Second Modification, and

---

[264] Cicoski Tr. 237.

[265] *See id.* at 249.

[266] *See id.* at 238; McHugh Dep. 40.

[267] JX 34 at 1–2. Although the resolution could be read either to require both Cicoski and Azzopardi to sign the Loan or to authorize either Cicoski or Azzopardi to act, the record establishes that the latter was the intent. Cicoski Tr. 383–84. To clarify matters and confirm that interpretation, they executed a second written consent on February 15, 2023. Cicoski Tr. 272; JX 49.

the Settlement Agreement.[268] Ritchie knew about the Settlement Agreement and was happy with the result.[269]

Cicoski had actual authority to enter into both the Loan and the Settlement Agreement.

### b. The Board Majority Requirement

Alpha and the Borrower argue that the Loan lacked proper authorization because under the Borrower's bylaws, only a majority of the Borrower's board of directors could approve the Loan. When the Borrower entered into the Loan, its board comprised both Wolfe and Cicoski. For several reasons, this argument does not prevent the Lender from enforcing the Settlement Agreement.

The Borrower relies on a provision in its bylaws which states that "without prior approval of a majority of the Board of Directors of the [Borrower], . . . the [Borrower] shall not . . . incur . . . any indebtedness, absolute or contingent of any nature whatsoever, if the [Borrower]'s aggregate indebtedness would exceed the indebtedness expressly provided for in the Approved Budget by $500,000" or "create any mortgage, lien, security interest or encumbrance on any asset of the [Borrower]

---

[268] JX 49 at 1–2.

[269] *See* Cicoski Tr. 308 ("I remember that Mr. Ritchie was happy [about the Settlement Agreement] because Mr. Brownell, to get this done, had to give up some of the fees—actually all of the fees, I believe—that he would otherwise have earned . . . ."). To the extent some of Ritchie's manifestations regarding the Loan and the Settlement Agreement came through Brownell, Cicoski still reasonably believed that Ritchie provided them. Ritchie communicated with Brownell constantly—far more frequently than with Cicoski—and commonly relied on Brownell to convey his wishes. *See id.* at 243–44, 307–08.

of any of its subsidiaries, other than in the ordinary course of business" (the "Board Majority Requirement").[270] The record contains no evidence as to the Borrower's "Approved Budget" or what sort of "mortgage, lien, security interest or encumbrance" would be outside the ordinary course of business. As the party invoking the bylaw as a defense, Alpha and the Borrower bore the burden of proving that the Loan exceeded the Approved Budget by $500,000 or was outside the ordinary course. They did not carry that burden.

Assuming without deciding that the Loan was outside the ordinary course of business or exceeded the Approved Budget in an amount sufficient to trigger the Board Majority Requirement, the record reflects that the Loan did not satisfy it. Under Delaware law, the board needed to act formally by unanimous written consent[271] or through action at a duly called and convened meeting at which a quorum was present.[272] The record does not contain persuasive evidence of either.

That failure, however, is not fatal. As Alpha and the Borrower correctly argue, a failure to comply with the bylaw would constitute a failure of authorization, not of

---

[270] JX 2 at 7–8.

[271] 8 *Del. C.* § 141(f).

[272] *Id.* § 141(b).

corporate power.[273] The Loan was therefore voidable, not void,[274] and majority stockholder ratification could validate it.[275] The Ratifying Consent delivered unanimous stockholder ratification, which could even validate waste.[276] The Ratifying Consent therefore authorized the Loan notwithstanding any failure to meet the Board Majority Requirement.

The authority defense based on the Board Majority Requirement also fails because of the equitable maxim that "[e]quity regards as done what ought to have been done."[277] When an act is voidable, rather than void, a court of equity can enforce it where the equities require. Here, the equites favor the Lender because Wolfe in fact

---

[273] *Moelis & Co. v. W. Palm Beach Firefighters' Pension Fund*, — A.3d —, —, 2026 WL 184868, at *6–7 (Del. Jan. 20, 2026) (holding that if corporation could achieve transactional outcome under some path provided by the DGCL, then the corporate power to act exists and the failure to follow that path renders the act voidable rather than void).

[274] *XRI Inv. Hldgs. LLC v. Holifield*, 283 A.3d 581, 667 (Del. Ch. 2022) (collecting authorities), *aff'd in part, rev'd in part on other grounds and remanded*, 304 A.3d 896 (Del. 2023).

[275] *Michelson v. Duncan*, 407 A.2d 211, 219 (Del. 1979) ("Generally, any act of the board of directors or of any of the officers beyond the scope of their authority . . . may be ratified by the stockholders . . . ."); *Gerlach v. Gillam*, 139 A.2d 591, 593 (Del. Ch. 1958) ("It is contended and cannot be denied that where a majority of fully informed stockholders ratify action of even interested directors, an attack on the ratified transaction normally must fail.").

[276] *Schreiber v. Bryan*, 396 A.2d 512, 518 (Del. Ch. 1978); *Kaplan v. Goldsamt*, 380 A.2d 556, 567–68 (Del. Ch. 1977).

[277] *Stream TV Networks*, 250 A.3d 1016, 1030 (Del. Ch. 2020) (refusing to allow defendants to take advantage of their failure to take contractually mandated action to avoid the contractual obligation).

knew about and approved the Loan, and Ritchie was both fully aware of what was going on and wanted the Loan closed. Any failure to comply with the Board Majority Requirement resulted from Ritchie's insistence on avoiding any semblance of corporate governance and his refusal to let his team properly document his decisions. Ritchie instructed his team not to keep written records, demanded that documentation be kept to a minimum, and provided approvals through informal means, such as a "thumbs-up" emoji in an ephemeral message.[278]

Under the standards followed by the Family Office, Wolfe approved the Loan. He told Cicoski to get the Loan done on any terms available.[279] He received regular reports on the Loan and never objected to it.[280] Although Wolfe later denied knowing about or authorizing the Loan, his testimony was not credible. He admitted knowing that money moved from Tailwind's counsel's account to Mack's IOLTA account.[281] He admitted knowing that Alpha received a portion of the proceeds.[282] He admitted knowing that the Borrower benefited by having its debt to Dominion Bank repaid.[283]

---

[278] *See* Cicoski Tr. 296.

[279] *Id.* at 236–37.

[280] *See id.* at 282.

[281] *See* Wolfe Tr. 697–98.

[282] *See id.* at 708–09.

[283] *See id.*

He knew where the money came from and was fine with it. The same is true for Ritchie.

Finally, the Settlement Agreement separately ratified any defect in the Loan. Under the common law of agency, a principal may ratify an earlier contract voidable for lack of authority by entering into an agreement that affirms or promises to perform the antecedent contract.[284] A party may ratify a contract by any conduct indicating assent to the contract.[285] The principal himself may take the ratifying act or may do so through an agent. "Although ratification is often done by a party or parties distinct from the actor whose conduct is being ratified, that dichotomy is not

_____

[284] *See* Restatement (Third) Of Agency § 4.01 ("Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority."); 12 Williston on Contracts § 35:22 (4th ed.) ("Ratification may be defined generally as the adoption or confirmation of a prior act purportedly performed on the principal's behalf by an agent without the agent obtaining prior authority. . . . The subsequent affirmance by a principal of a contract made on its behalf by one who had at the time neither actual nor apparent authority constitutes a ratification, which relates back and supplies original authority to execute the contract."); *Lewis v. Vogelstein*, 699 A.2d 327, 334 (Del. Ch. 1997) ("Ratification is a concept deriving from the law of agency which contemplates the *ex post* conferring upon or confirming of the legal authority of an agent in circumstances in which the agent had no authority or arguably had no authority." (citing Restatement (Second) of Agency § 82 (1958)); *see also* Restatement (Second) of Contracts §§ 85, 93 (1981) ("[A] promise to perform all or part of an antecedent contract of the promisor, previously voidable by him, but not avoided prior to the making of the promise, is binding," as long as "the promisor knew or had reason to know the essential facts of the previous transaction to which the promise relates.").

[285] *See* 12 Williston on Contracts § 35:23 ("Ratification need not be express. Any conduct that indicates assent by the purported principal to become a party to the transaction, or by reason of which the principal is precluded from repudiating the transaction of the purported agent, such as the principal's receipt and acceptance of benefits, is sufficient." (footnotes omitted)).

required."[286] An agent with proper authority may act on the principal's behalf to ratify an earlier act of the agent whose authority is in dispute.[287]

The Settlement Agreement ratifies any defect in the Loan by recognizing and reaffirming the validity of the earlier contract. It states:

A.     Borrower and Lender are parties to a certain Loan and Security Agreement dated as of February 2, 2023 (the Original Loan & Security Agreement"), evidencing and governing a certain loan made by Lender to Borrower in the principal amount of $10,000,000 (the "Original Loan"), which is evidenced by that certain Promissory Note executed by Borrower to the order of Lender dated February 2, 2023 . . . .

B.     On February 16, 2023, the Lender and the Borrower entered into that certain First Amendment to Loan & Security Agreement to make certain revisions to the terms of the Original Loan & Security Agreement . . . .

C.     On June 16, 2023, Lender and the Borrower amended the Original Loan & Security Agreement by entering into that certain Second Loan Modification and Ratification Agreement by and among the Borrower, the Lender and the Principals . . . .[288]

---

[286] *Glass v. Baker*, 2024 WL 687755, at *16 (Del. Ch. Feb. 9, 2024) (footnote omitted), *adopted*, (Del. Ch. 2024), *aff'd*, 339 A.3d 745 (Del. 2025).

[287] *See, e.g., id.* ("When an agent is validly appointed . . . , the principal authorizes the agent to execute the agent's certification and begin acting on the principal's behalf. If the agent fails to execute the certification, yet purports to act as agent for the principal, those actions are voidable. But, if those actions are not first voided by the principal, the agent is authorized (through the principal's initial and continued appointment) to ratify their post-appointment conduct after signing the agent's certification." (footnotes omitted)).

[288] JX 94 at 1–2.

71

Ordinarily, recitals are not binding and only provide context.[289] But parties can make them binding.[290] In the Settlement Agreement, the parties "acknowledge the accuracy of the recitals set forth above, which are incorporated herein as if set forth herein and form a part of this Agreement."[291] In effect, the parties stipulated that the recitals were true. The Settlement Agreement also contained an integration clause establishing that its terms embodied "the entire agreement and understanding between the Parties."[292]

Through the recitals, the parties to the Settlement Agreement ratified the validity of the prior documents, including the Loan Agreement. To the extent there were potential disputes over the prior documents, the integration clause resolved those disputes and merged the rights that existed under the prior agreements,

---

[289] *Llamas v. Titus*, 2019 WL 2505374, at *16 (Del. Ch. June 18, 2019) ("Generally, recitals are not a necessary part of a contract and can only be used to explain some apparent doubt with respect to the intended meaning of the operative or granting part of the instrument. If the recitals are inconsistent with the operative or granting part, the latter controls.").

[290] *See* 17A C.J.S. Contracts § 420 ("Recitals in a contract, such as 'whereas' clauses, are merely explanations of the circumstances surrounding the execution of the contract, and are not binding obligations, *unless the operative provisions of the contract refer to them*." (emphasis added)); D. Hull Youngblood, Jr., *7 Deadly Sins of Contract Drafting: Constructive Interpretation and Interpretative Construction*, 34 Corp. Counsel Rev. 155, 162 (2015) ("[I]f there is language in the agreement that leads the reader to believe the parties intended to be bound by the recitals, in essence the statements are no longer recitals, but have become covenants of the agreement, just as the other agreed-upon terms and covenants bind the parties.").

[291] JX 94 § 1.

[292] *Id.* § 11.

including any disputes about their existence and scope, into the single agreement embodied in the Settlement Agreement.

Thus, the Settlement Agreement cured any defect in the Loan Agreement. When the Lender and the Borrower entered into that agreement, Wolfe was no longer a member of the Borrower's board. Cicoski was the Borrower's sole director. His approval of the Settlement Agreement as the sole director satisfied the Board Majority Requirement.

### c. The Wyoming Trust Law Issue

Alpha and the Borrower further argue that the Loan and Settlement Agreement were not validly approved under Wyoming law. That argument is misguided.

The Family Trust is organized under Wyoming law, which mandates that a trustee "keep the qualified beneficiaries of the trust reasonably informed about the administration of the trust and of the material facts necessary for them to protect their interests."[293] Cicoski was a director of the Family Trustee, and Ritchie's wife and children were the beneficiaries of the Family Trust. Alpha and the Borrower contend that Cicoski had to inform Ritchie's wife and children about the Loan and the Settlement Agreement. Because he did not, they say that his actions violated Wyoming law, rendering the Loan and Settlement Agreement invalid.

---

[293] Wyo. Stat. § 4-10-813(a).

73

Assuming for purposes of analysis that Cicoski violated Wyoming trust law, that failure does not prevent the Lender from enforcing the Loan or Settlement Agreement against the Borrower, at least without some showing that the Lender knew about the violation and aided and abetted it.[294] Perhaps the Family Trust's beneficiaries might have a claim for damages against the Family Trust, but they cannot impair the Lender's contract rights.

On the merits, however, the argument under Wyoming law falls short. The limited case law interpreting or applying the Wyoming statute generally recognizes that a trustee is "obligated to report on a regular basis to . . . [the] Trust beneficiaries, concerning the status of the Trust, and to provide them all relevant information concerning the Trust."[295] Yet Wyoming law also provides that "[n]otice to a person who may represent and bind another person under this article has the same effect as if notice were given directly to the other person."[296] The Family Trustee's operating agreement expressly identified Ritchie as the "designated relative" and "Family

---

[294] *See C & J Energy Servs., Inc. v. City of Miami Gen. Emps.'*, 107 A.3d 1049, 1071 (Del. 2014) (reversing issuance of injunction impairing counterparty's contract rights where "[t]he Court of Chancery made no finding, even on a preliminary basis, that [the counterparty] aided and abetting the C & J board's alleged breach of fiduciary duties").

[295] *Redland v. Redland*, 2013 WL 9678730, at *15 (Wyo. Dist. Dec. 24, 2013); *see In re Phyllis V. McDill Revocable Trust*, 506 P.3d 753, 762 (Wyo. 2022) (describing statute as "impos[ing] . . . a duty to inform and report upon the trustee").

[296] Wyo. Stat. § 4-10-301(a).

Member" under Wyoming law.[297] Ritchie was the real party in interest who controlled the Family Trust, and Cicoski reasonably believed that by keeping Ritchie informed, he was keeping the ultimate beneficial owners of the trust informed.[298]

### 2. Intent To Be Bound

For a valid contract to exist, the parties must intend to be bound. "Under Delaware law, 'overt manifestation of assent—not subjective intent—controls the formation of a contract.'"[299] "Whether both of the parties manifested an intent to be bound 'is to be determined objectively based upon their expressed words and deeds as manifested at the time rather than by their after-the-fact professed subjective intent.'"[300]

"When presented with a facially valid contract, the court will defer to the parties' signed writing unless there is evidence to the contrary."[301] The Settlement Agreement is a facially valid contract. Springett signed for the Lender, and Cicoski

---

[297] *See* JX 247 at 1–2; Wyo. Stat. § 13-5-301 (defining "Family Member" and "Designated relative").

[298] *See* Cicoski Tr. 458 (testifying about having "limited" contact with Family Trust beneficiaries and that trust counsel named Ritchie the "designated relative" so communication could run through Ritchie).

[299] *Black Horse Cap., LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *12 (Del. Ch. Sept. 30, 2014) (quoting *Indus. Am., Inc. v. Fulton Indus., Inc.*, 285 A.2d 412, 415 (Del. 1971)).

[300] *Id.* (quoting *Debbs v. Berman*, 1986 WL 1243, at *7 (Del. Ch. Jan. 29, 1986)).

[301] *Restanca, LLC v. House of Lithium, Ltd.*, 2023 WL 4306074, at *18 (June 30, 2023) (citing *Malkani v. Cunningham*, 2023 WL 1383938, at *8 (Del. Ch. Jan. 31, 2023)).

signed for the Borrower.[302] That alone provides strong evidence of the parties' intent to agree.

When evaluating whether parties intend to be bound, a court can consider "a reneging party's post-signing conduct if it reflects an objective manifestation of the reneging party's intent to be bound by the agreement."[303] Here, the Borrower is the reneging party, so the court can consider its post-signing conduct to the extent it reflects an intent to be bound. In this case, the Borrower partially performed through its transfer of the Proton Green shares, providing an objective manifestation of its intent to be bound.[304] There is no credible evidence to the contrary.

### 3. Sufficiently Definite Terms

A valid contract also requires sufficiently definite terms. To meet this element, the terms must "provide a basis for determining the existence of a breach and for giving an appropriate remedy."[305] In other words, "[a] contract is sufficiently definite and certain to be enforceable if the court can—based upon the agreement's terms and

---

[302] JX 94 at 7; *see* Springett Tr. 76–77 (testifying about entering into Settlement Agreement); Cicoski Tr. 305 (same).

[303] *See Restanca*, 2023 WL 4306074, at *21.

[304] *See* Springett Tr. 77–79.

[305] *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1232 (Del. 2018) (quoting Restatement (Second) of Contracts § 33(2)).

applying proper rules of construction and principles of equity—ascertain what the parties have agreed to do."[306]

Whether terms are sufficiently definite is a question of contract formation, not interpretation. The issue is not whether any terms are ambiguous.[307] When parties claim an agreement they signed was too indefinite, that argument "frequently is an afterthought excuse."[308] "If the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left."[309]

Alpha claims that the Settlement Agreement lacks sufficiently definite terms but does not explain why. Later, when arguing against specific performance, Alpha

---

[306] *Id.*

[307] *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233–34 (Del. 1997) ("The reality is that the contractual language defining rights and obligations of the parties is sometimes ambiguous. It is a court's duty to preserve to the extent feasible the expectations that form the basis of a contractual relationship. When, as in the instant case, the meaning and application of contract terms are uncertain, a court fulfills this duty by considering extrinsic evidence.").

[308] 1 Arthur L. Corbin et al., *Corbin on Contracts* § 4.1 (1993).

[309] *Id.*; *see Eagle Force*, 187 A.3d at 1232–38 (holding that contract terms were sufficiently definite); *cf. Black Horse*, 2014 WL 5025926, at *18 (holding at the pleadings stage that it was not reasonably conceivable that an agreement's terms were sufficiently definite where the complaint's allegations did not "support a reasonable inference that the parties reached an agreement as to the meaning of [the asset to be transferred]").

contends that the Settlement Agreement lacks the essential terms of a real estate sale contract.[310] That is because it was not a real estate sale contract. It was a settlement agreement that resolved a default under a loan. It did not need to have all the terms that a real estate contract would have.

The Settlement Agreement contains sufficient terms to determine breach and award a remedy. The agreement defines the underlying obligations and the collateral.[311] It contains accurate recitals.[312] It provides for a specific amount of settlement fees to be paid using the Proton Green shares.[313] It treats the Lender's ownership of the collateral as satisfying the Loan.[314] And it includes detailed mutual releases.[315] The parties may disagree over the content of those obligations, but the Settlement Agreement is sufficiently definite to constitute a valid contract.

### 4. Consideration

The final element is consideration. "To constitute consideration, a performance or a return promise must be bargained for."[316]

---

[310] Dkt. 276 at 30–31.

[311] JX 94 at 1–2.

[312] *Id.* § 1.

[313] *Id.* § 3.

[314] *Id.* § 4.

[315] *Id.* § 5.

[316] Restatement (Second) of Contracts § 71(1).

An exchange of consideration supported the Settlement Agreement. The Lender provided a release and accepted the collateral and the Proton Green shares in satisfaction of its claims.[317] The Borrower agreed that the Lender owned the collateral and agreed to transfer title to the Proton Green shares. That is enough.[318]

Alpha argues that the Settlement Agreement lacks consideration because the Loan was invalid in the first place. That argument depends on Cicoski's lack of authority, a position this decision has rejected.

## B. The Borrower Breached The Settlement Agreement.

Because the Settlement Agreement is a valid and enforceable contract, the next question is whether the Borrower breached it. The Lender proved breach.

### 1. The Obligation

Whether a breach occurred turns on the content of the contract. When determining what a contract means, "the role of a court is to effectuate the parties' intent."[319] Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[320] "When the contract is clear and

---

[317] *See* JX 94.

[318] *See Seiden v. Kaneko*, 2017 WL 1093937, at *5, 7 n.46 (Del. Ch. Mar. 22, 2017), *aff'd*, 177 A.3d 69 (Del. 2017) (noting that a "mutual release of all claims would itself be sufficient to constitute adequate consideration").

[319] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[320] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016).

unambiguous," the court "will give effect to the plain-meaning of the contract's terms and provisions."[321] Only when a court "may reasonably ascribe multiple and different interpretations to a contract" will the contract be found ambiguous.[322] If one of the two proffered interpretations "produces an absurd result or one that no reasonable person would have accepted when entering the contract," then that interpretation is unreasonable and does not create ambiguity.[323]

As discussed previously, the parties agreed to the accuracy of the recitals in the Settlement Agreement, thereby establishing a set of stipulated facts that served as a background against which the Settlement Agreement operated.[324] In the recitals, the parties agreed that:

> D.   The indebtedness evidenced by the Note is secured by, *inter alia*, certain liens and security interests granted under (i) the [Loan Agreement] . . . , (ii) the Pledge and Security Agreement [covering the Subsidiary's shares, and] (iii) the mortgages granted by [the Florida Subsidiary], a Florida corporation and wholly-owned subsidiary of the Borrower . . . encumbering [the Properties] . . . .

> F.   The [Loan Agreement], the Pledge, the Guaranties, and all other documents, instruments and agreements evidencing, securing or relating to the Original Loan, each as amended, restated and/or modified from time to time, are hereinafter collectively referred to as the "Loan Documents". All property pledged to the Lender to secure the obligations evidenced or governed by the Loan Documents, including without limitation, the shares of [the Florida Subsidiary] and the

---

[321] *Osborn*, 991 A.2d at 1159–60.

[322] *Id.* at 1160.

[323] *Id.*

[324] JX 94 § 1 (agreeing to "the accuracy of the recitals set forth above, which are incorporated herein as if set forth herein and form a part of this Agreement").

80

Properties . . . will be referred to herein collectively as the "Collateral".
. . .

I.      As the [the Borrower] failed to agree to the terms proposed in the Notice of Event of Default and Conditions for Standstill, (i) the Borrower remains in breach of its obligations under the Loan Documents; (ii) the Lender exercised its right under Section 7.2 of the [Loan Agreement], as amended; and (iii) the Collateral, including the Subsidiary Shares, is now held in the name of Lender. . . .[325]

Through these stipulations, the parties agreed that (1) the Borrower owned all of the Subsidiary Shares, (2) the Florida Subsidiary granted the mortgages on the Properties to secure the Loans, (3) the collateral for the Loan included both the Subsidiary Shares and the Properties, (4) the Borrower had breach the Loan and related documents, and (5) the Collateral—meaning the Subsidiary Shares and the Properties—was held in the name of the Lender.

In the Settlement Agreement, the Borrower agreed to pay two fees, both in the form of shares of Proton Green stock. One was a "Tailwind Fee" payable to Tailwind, and the other was a "Lender Settlement Fee" payable to the Lender (jointly, the "Settlement Fees").[326]

The Settlement Agreement further provided that once the Settlement Agreement was executed, thereby memorializing the stipulations, and once the Settlement Fees were paid, then "the Loan is satisfied in full."[327] Once that occurred,

---

[325] *Id.* at 1–2.

[326] *Id.* § 3.

[327] *Id.* § 4.

the Borrower "shall have no further liability to the Lender with respect to the Loan."[328]

Read as a whole, the Settlement Agreement contemplates a basic exchange: the Lender received the collateral and the Settlement Fees in return for giving the Borrower a release of all claims. The Borrower breached that agreement by insisting that it still owned the collateral.

To negate that breach, the Borrower and Alpha contend that the Settlement Agreement did not transfer ownership of the Properties or the Subsidiary Shares to the Lender. They say the Settlement Agreement merely required payment of the Settlement Fees and left the Lender's ownership of the collateral intact.

The plain meaning of the Settlement Agreement refutes that interpretation. The parties stipulated that the Lender already held the Properties and the Subsidiary Shares in its own name. There was no need for a transfer in light of that agreement. The Borrower gave up any rights to the Properties and the Subsidiary Shares by granting the Lender a release.[329]

The interpretation that the Borrower and Alpha advance, by contrast, "would lead to absurd and unfounded results" that "no reasonable person would have accepted when entering the contract."[330] The parties entered into the Settlement

---

[328] *Id.*

[329] *See id.* § 5.

[330] *Miramar Police Officers' Ret. Plan v. Murdoch*, 2015 WL 1593745, at *9 (Del. Ch. Apr. 7, 2015); *see Osborn*, 991 A.2d at 1160–61.

Agreement to "settle any and all claims under the Loan Documents."[331] Those claims included the Lender's right to recover $11 million in principal, plus interest. It would have been irrational for the Lender to release its claims in return for only the Proton Green shares, which were worth much less. That is not a reasonable reading of the Settlement Agreement.

To rescue its unreasonable interpretation, Alpha argues that the reference to the Lender having an ongoing "security interest" in the collateral is inconsistent with the Lender owning the collateral. As a matter of metaphysical curiosity, angels could dance on the head of that pin. But the Lender understandably feared a situation like it ultimately faced in which the Borrower reneged on its commitments. The Lender did not want to give up enforceable security interests and be left with only an executory contract. Alpha's interpretation remains unreasonable.

Assuming counterfactually that Alpha had advanced a reasonable interpretation, the extrinsic evidence defeats it. When interpreting an ambiguous contract, a court considers

> all admissible evidence relating to the objective circumstances surrounding the creation of the contract. Such extrinsic evidence may include overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry.[332]

---

[331] JX 94 at 2.

[332] *Salamone v. Gorman*, 106 A.3d 354, 374–75 (Del. 2014).

Here, the extrinsic evidence shows that the Borrower gave up the Properties, the Subsidiary Shares, and the Proton Green shares in exchange for the Lender releasing all of its claims. That is how Springett described the deal contemporaneously to his investors.[333] That is how Springett and Cicoski described the deal at trial.[334]

Removing any doubt, that is what a subsequent amendment to the Settlement Agreement confirmed the deal to be. The amendment added a provision stating, "On the date of this Agreement, Borrower relinquishes any residual rights or claims it may have to the Subsidiary Shares to Lender."[335] In the amendment, the parties also agreed that the Lender was the sole owner of the Subsidiary Shares and that there were no other liens or claims to the Properties.[336] Alpha and the Borrower claim there was no consideration for the amendment because the Settlement Agreement had released all of the Lender's claims. The court need not reach that issue, because even if the amendment was not an enforceable contract, it provides persuasive extrinsic evidence confirming the nature of the deal memorialized in the Settlement Agreement.

---

[333] JX 486 at 7 ("We have received a signed settlement offer from the Borrower in the deal . . . . In short, the offer is to hand over the St. Barths [*sic*] properties to the Lender along with an allotment of shares in a private company they own.").

[334] *See* Springett Tr. 76–77; Cicoski Tr. 306–07.

[335] JX 95 at 2.

[336] *Id.*

## 2.      Breach

The Borrower breached the Settlement Agreement by continuing to claim that it owned the Subsidiary Shares and the Properties when it gave up its rights to them in the Settlement Agreement. The Borrower claimed that the Island Subsidiary had not redomiciled to Florida as the Florida Subsidiary, that the Island Subsidiary still owned the Properties, and that the Borrower still owned the Subsidiary Shares. The Borrower also claimed that the mortgages encumbering the Properties were invalid. By taking those positions, the Borrower breached the Settlement Agreement.

The Borrower also breached the Settlement Agreement by filing the Guadeloupe Civil Action, filing the Guadeloupe criminal complaint, sending the Guadeloupe criminal complaint to civil authorities in St. Barts, changing the locks on the Properties, and sending cease-and-desist letters to the Lender's architect. The Borrower further breached the Settlement Agreement by purporting to change the name of the Island Subsidiary to Vue Mer and purporting to appoint Vail as its chairman, then filing documents reflecting those purported actions with a local commercial registry. Those actions interfered with the Lender's possession and ownership of the Properties and the Subsidiary Shares.

Alpha and the Borrower contend that they could not have breached the Settlement Agreement because the Borrower never had any obligation to transfer the Properties or the Subsidiary Shares to the Lender.[337] That position is absurd. The

---

[337] *See* Dkt. 276 at 27–28.

Borrower agreed in the Settlement Agreement that the Lender already owned those assets.

Alpha separately argues that the Borrower could file legal actions in the Caribbean courts to pursue its rights, and if the Borrower had a good-faith basis for its position, then it could have. Here, the Borrower lacked any good-faith basis for disputing the Settlement Agreement. Its bad-faith filings breached the Settlement Agreement.

## C.    The Release Defense

Alternatively, Alpha and the Borrower argue that even if the Borrower did breach the Settlement Agreement, the Lender released its claim for breach. That argument is specious.

The Settlement Agreement contains a release running from the Lender to the Borrower and its affiliates. It states:

> Upon the execution of this Agreement and payment of the Loan Settlement Fee and Tailwind Fee (which, for the avoidance of doubt, shall include the actual transfer of the Proton Green Shares to Lender and Tailwind in the books of the transfer agent), Lender and Tailwind, on behalf of themselves, and on behalf of their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, companies under common control with any of the foregoing, Affiliates and assigns, and its and their past, present and future officers, directors, shareholders, interest holders, members, partners, attorneys, agents, employees, managers, representatives, assigns and successors in interest, and all persons acting by, through, under or in concert with them (collectively and each of them, the **"Affiliates"**) hereby release and discharge the Obligors and their Affiliates from any and all known or unknown charges, complaints, claims, grievances, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees and expenses (including offsets and attorneys' fees and costs actually incurred), of any nature whatsoever, known or unknown, which either Lender and/or Tailwind has, or may have had, against the other

86

Party, whether or not apparent or yet to be discovered, or which may hereafter develop and for any acts or omissions related to or arising from the Loan (the **"Claims"**).[338]

Agreements containing broad releases like this one often include precautionary language saying that the release does not extend to claims to enforce the agreement in which it appears. Alpha argues that because the Settlement Agreement lacks that precautionary language, the Lender released any claim to enforce the Settlement Agreement, because that claim would constitute a claim for "acts or omissions related to or arising from the Loan."[339]

That interpretation makes no sense. The Settlement Agreement, by its terms, only released present or past claims—claims "which either Lender and/or Tailwind *has*, or *may have had*."[340] At the time of the Settlement Agreement, the Borrower's actions that led to the Lender's claim to enforce that agreement had not yet occurred. If the Settlement Agreement released the Lender's claims to enforce that very agreement, then the agreement itself would be a nullity. That would mean the Borrower could ignore its obligations under the Settlement Agreement, and the

---

[338] JX 94 § 5.

[339] The amendment to the Settlement Agreement may have inspired Alpha's argument. It added an express carveout for "any claims resulting from fraud or willful misconduct or any rights under [the Settlement Agreement]." JX 95 at 3. That was an obvious attempt at belt-and-suspenders drafting. At a minimum, it clarifies the parties' intent.

[340] JX 94 § 5 (emphasis added).

Lender would have no recourse. No party would agree to that result.[341] The court will not adopt an absurd interpretation.

Alpha's argument also fails as a matter of law because it would involve the release covering claims that had not yet arisen at the time of execution. A settlement agreement cannot release "claims arising from an event that ha[d] not yet happened."[342]

> A settlement can release claims that were not specifically asserted in an action, but can only release claims that are based on the "same identical factual predicate" or the "same set of operative facts" as the underlying action. Thus, it follows that a release is overly broad if it releases claims based on a set of operative facts that will occur in the future. If the facts have not yet occurred, then they cannot possibly be the basis for the underlying action.[343]

The Delaware Supreme Court has followed this holding in several cases, confirming that a settlement cannot release claims based on yet-to-occur operative facts.[344] Even if the parties had so intended, the Settlement Agreement could not release the

---

[341] *See Osborn*, 991 A.2d at 1159–61.

[342] *UniSuper Ltd. v. News Corp.*, 898 A.2d 344, 348 (Del. Ch. 2006).

[343] *Id.* at 347 (quoting *Nottingham P'rs v. Dana*, 564 A.2d 1089, 1106–07 (Del. 1989) (footnotes omitted).

[344] *See Griffith v. Stein*, 283 A.3d 1124, 1134–35 (Del. 2022); *In re Philadelphia Stock Exchange, Inc.*, 945 A.2d 1123, 1146–47 (Del. 2008); *see also In re AMC Entm't Hldgs., Inc. S'holder Litig.*, 299 A.3d 501, 526 (Del. Ch. 2023) (explaining that Delaware follows the "identical factual predicate test"). A covenant not to sue, by contrast, can address claims based on future acts. *See New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 536 (Del. Ch. 2023) ("A covenant not to sue can apply to future as well as to present claims. Unlike a release, where the cancellation of the claim and the discharge of the released party are complete upon execution, the covenant not to sue is an executory contract that contemplates ongoing performance." (cleaned up)).

Lender's claims to enforce it based on the Borrower's future acts reneging on the agreement.

**D.     The Fraud Defenses**

Alpha and the Borrower next raise a series of defenses based on the allegedly fraudulent nature of the Loan. None of those defenses succeed. Each is a fabrication resulting from Vail's conspiracy-theory-driven investigation.

First, Alpha and the Borrower argue that the Loan was a sham and that the Borrower never received any benefit from it. To the contrary, the Loan was real, and the Borrower benefited to the tune of $10 million. The Borrower's outside counsel received $9,749,910 (the remainder went to transaction fees). He transferred the proceeds as the Family Office directed—either to Alpha, directly to the Borrower's creditors, or to pay other fees.[345] The Borrower benefited from having its debts repaid, received at least $3.65 million in its bank account, and used those funds to pay Dominion Bank.[346] Wolfe admitted at trial that the complaint's allegation that the Lender "never intended to loan any money to Green Sapphire and never actually delivered any money to Green Sapphire" was not accurate.[347] Vail, by contrast,

---

[345] *See* JX 39; JX 54; JX 55.

[346] JX 60; Johnston Tr. 512–17.

[347] Wolfe Tr. 707.

persisted in insisting that the Lender "never actually delivered money to anybody."[348] That testimony was knowingly false.

Second, and more expansively, Alpha and the Borrower argue that Brownell orchestrated the Loan as part of his efforts to defraud Ritchie through a criminal loan-to-own scheme. They argue that Brownell paid off Cicoski to participate in the plot. But that is not what happened. As support, they point to Brownell's earlier criminal conviction and claim that Brownell sought to defraud Ritchie. But Ritchie and his associates knew about Brownell's criminal past; they never raised it as an issue until after Brownell and Ritchie had a falling out over other transactions.[349]

To bolster the fraud theory, Alpha and the Borrower argue that the Loan was too expensive to be legitimate, but that is historical revisionism. The Buyer was in the midst of a liquidity crisis and needed funds desperately and quickly. Its only security was real property located in a foreign jurisdiction. The initial efforts to find investors failed. If the Borrower had not received the funds, it would have defaulted on a series of obligations, lost valuable collateral, and suffered negative consequences in litigation.[350] The terms of the Loan reflected those realities. The closing prompted celebration in the Family Office.[351]

---

[348] Vail Tr. 731.

[349] *See* Cicoski Tr. 257, 259, 376, 391.

[350] *Id.* at 231–36, 282.

[351] *Id.* at 282.

Alpha and the Borrower similarly argue that the extension of the Loan was too expensive to be legitimate, but that is more revisionist hindsight. When the Borrower could not repay the Loan by the deadline, the Loan became riskier for the Lender. The Lender agreed to extend the deadline in exchange for additional fees and interest, but the Borrower had no money to pay those fees. So the Lender also loaned an additional $1 million to the Borrower that largely covered the fees that the Borrower could not afford to pay. The Borrower never repaid the Loan and defaulted, leading to the Settlement Agreement.

When Brownell arranged the Loan, he was acting as Ritchie's agent and friend, not as his enemy.[352] Facing a liquidity crisis, Ritchie tasked Brownell with securing a short-term bridge loan on whatever terms were necessary.[353] Ritchie agreed to use the Properties as collateral.[354] Brownell set up the Loan so that investors would fund it, and his control over the Lender benefited Ritchie by ensuring that his longtime friend would have to sign off on any enforcement efforts. But after Brownell could not fund the loan from his network and had to pass the deal on to Tailwind, the Tailwind investors were not willing to fund a vehicle they did not control. Brownell transferred the Lender to Tailwind and stepped into a guarantor role. The Loan called for

---

[352] *See id.* at 243–44 (testifying to Brownell's status as Ritchie's "closest confidant" and longtime trusted advisor who would commonly set up transactions on Ritchie's behalf).

[353] *See id.* at 243, 249.

[354] *See id.* at 241; McHugh Dep. 40.

Brownell to receive fees that would pay him for his services and potentially repay him for other amounts due from the Family Office, but he never received any of those amounts.[355] A portion of the Loan proceeds went to repay one prior loan Brownell secured for the Family Office.[356] Otherwise, he did not receive any benefit from the Loan or Settlement Agreement. Brownell was helping Ritchie, not plotting against him.

But even if Alpha and the Borrower had succeeding in proving Brownell was a bad actor, that showing would not vitiate the Lender's rights. Tailwind and Springett had no involvement in any hypothetical loan-to-own scheme and no prior connection to Brownell. Alpha and the Borrower now fault Springett for not uncovering Brownell's criminal history, but Tailwind was striving to meet the Borrower's exigencies and prioritized ensuring that it had adequate security for a high-risk loan. Tailwind was making a hard money loan secured by collateral, not the creditworthiness of the person who seemed to be arranging the terms as the Borrower's agent. Springett engaged in a reasonable level of know-your-customer due diligence.

Springett also was not hoping to acquire the Properties. He testified credibly that he and his investors wanted their money, interest, and fees. They did not want to foreclose on the Properties and become real estate flippers. Springett and his

---

[355] *See* JX 397 at 2–3; Cicoski Tr. 308.

[356] *See* JX 55; Cicoski Tr. 281–82.

investors acted consistently. They extended the maturity date, attempted to negotiate a forbearance agreement for weeks after the Borrower defaulted, and ultimately negotiated and entered into the Settlement Agreement.[357]

Finally, Alpha and the Borrower have leveled false and unjustified charges at Cicoski. Ritchie and Wolfe told Cicoski to help with the Loan and made clear that they had authorized the transaction.[358] Cicoski did what they asked. But for Ritchie's decision to repurpose the funds earmarked to repay the Loan at the last minute, the Borrower would not have defaulted. Ritchie's decision created a renewed crisis, which Cicoski resolved through the Settlement Agreement. Cicoski was looking out for Ritchie's interests as the Family Office's general counsel.

To undermine Cicoski's integrity, Alpha and the Borrower have cited payments Cicoski received through Brownell's family office, claiming they were bribes. They were not. They were part of Brownell's ongoing financial help to his then-friend Ritchie: Brownell paid a portion of Cicoski's salary when Ritchie could not.[359]

The Loan and the Settlement Agreement were not products of fraud.

## E. The Unclean Hands Defense

In a last-ditch effort, the Borrower asserts an unclean hands defense, claiming that "certain persons associated with Plaintiffs engaged in a deliberate and

---

[357] *See* Springett Tr. 68–71.

[358] Cicoski Tr. 237.

[359] *See id.* at 317, 321–22, 374–75.

coordinated online defamation campaign through cyber smear website as part of their broader scheme of fraudulent asset extractions and financial misconduct."[360] The Borrower did not substantiate any connection between the alleged perpetrators of this supposed cyber campaign and the Lender. The allegations are unrelated to this case. They provide no basis for the Borrower to escape the Settlement Agreement.

## IV. ALPHA'S FRAUDULENT TRANSFER CLAIMS

After this case began moving forward, Alpha intervened, purportedly as a third party adverse to the Borrower. Alpha asserted fraudulent transfer claims against both the Lender and the Borrower: four for actual or intentional fraudulent transfer and four for constructive fraudulent transfer. All of Alpha's claims fail because Alpha is not a bona fide creditor and its claims were collusive.

## A. Bona Fide Creditor Status

All of the causes of action under the Delaware Uniform Fraudulent Transfer Act ("DUFTA") are available only to a bona fide creditor.[361] Alpha claims to be a creditor of the Borrower under an agreement titled "Loan Agreement" and dated February 14, 2019 (the "Alpha Agreement").[362] In substance, Alpha is an equity investor, not a creditor.

---

[360] Dkt. 28 at 26.

[361] *See Burkhart v. Genworth Fin., Inc.*, 275 A.3d 1259, 1269 (Del. Ch. 2022) ("By its terms, DUFTA is inapplicable to non-creditors or non-debtors.").

[362] JX 4.

When assessing a creditor's claim, a court must "look past the form of the instruments to the substance of the transactions to determine their economic reality."[363] "The court looks to the economic reality of the surrounding circumstances, considering the facts that confer context case-by-case, to arrive at whether instruments functioned as debt or equity."[364] Factors like the corporation's capitalization, the presence or absence of fixed maturity dates, and the enforcement of payment rights "may serve as indicia of that reality."[365] Here, those indicia show that Alpha was not a bona fide creditor of the Borrower.

First, Alpha's advances to the Borrower more closely resemble equity investments than loans. Under the Alpha Agreement, the Borrower has no obligation to pay Alpha any principal or interest on a regular schedule and no repayment obligation of any kind until a date twenty years after each advance.[366] Although Alpha could nominally demand repayment at any time, Alpha never did. Wolfe testified that Ritchie advanced money under the Alpha Agreement to fund the Borrower's investments in illiquid real estate, intending that his family would profit

---

[363] *Neem Int'l CV v. Shulman*, 2025 WL 3778917, at *27 (Del. Ch. Dec. 31, 2025).

[364] *Id.* (cleaned up).

[365] *Id.*

[366] JX 4 at 2.

"when gains were realized."[367] Amounts would be repaid with interest "upon the successful realization of investments."[368]

In that structure, Alpha's advances "functioned as risk capital."[369] Unlike a creditor with a right to periodic repayments of principal and interest, Alpha would only receive its money back if the Borrower's investments were successful.[370] That structure is a "hallmark of equity" and "contrasts with debt instruments, which typically feature fixed maturity dates and mandatory interest payments regardless of corporate performance."[371] To be sure, Alpha had the right, in its "absolute discretion," to "require the Borrower to repay some or all of the Indebtedness at any time and from time to time."[372] But Alpha never made any repayment demands.[373] And recall that Alpha controlled the Borrower. Alpha would thus determine when repayments happened whether Alpha demanded the repayment or not.

---

[367] Wolfe Tr. 712.

[368] *Id.* at 713.

[369] *See Neem*, 2025 WL 3778917, at *27.

[370] *See Harbinger Cap. P'rs Master Fund I, Ltd. v. Granite Broad. Corp.*, 906 A.2d 218, 230 (Del. Ch. 2006) (holding that an instrument is equity where it provides "no guaranteed right of payment" and the holder's "fate . . . is tied directly to [the corporation's] business fortunes").

[371] *Neem*, 2025 WL 3778917, at *27.

[372] JX 4 § 2.03.

[373] *See* Azzopardi Tr. 610.

96

Second, all of Alpha's advances were unsecured. The Alpha Agreement authorized the Borrower to draw up to $50 million without the Borrower pledging any collateral to secure repayment.[374]

Third, the Borrower was inadequately capitalized. "When a corporation is undercapitalized, a court is more skeptical of purported loans made to it because they may in reality be infusions of capital."[375] The Borrower also did not generate any revenue, much less regular revenue, making the Borrower a poor credit risk for the type of long-term loan embodied in the Alpha Agreement. And Ritchie and Alpha were affiliates. Those facts all cut "against a finding of true debt" and suggest that the advances "were capital contributions and not loans."[376]

Fourth, Alpha operated outside the Alpha Agreement, including by transferring assets to the Borrower and loaning money in excess of the Alpha Agreement's nominal borrowing limit. The Borrower's accounting for the advances did not reflect bona fide loans either. The Borrower did not record Alpha's advances as debt or account for any interest until this litigation, when Ritchie's team retroactively altered the Borrower's books.[377] The lack of formalities operates in

---

[374] JX 8; JX 4; *see* JX 169 ¶ 35 ("Alpha Carta agreed to lend Green Sapphire approximately 1.7 times the total book value of its assets, without obtaining a security interest in those assets or a third-party guaranty.").

[375] *In re SubMicron Sys. Corp.*, 432 F.3d 448, 457 (3d Cir. 2006) (cleaned up).

[376] *Neem*, 2025 WL 3778917, at *27.

[377] *See* Johnston Tr. 497–504.

conjunction with the other factors to further undermine the characterization of the Alpha Agreement as a bona fide loan.

Taken together, the evidence shows that the Alpha Agreement was not a bona fide loan. It was a synthetic equity arrangement analogous to preferred stock. Preferred stock is a form of equity that often carries a liquidation preference equal to its initial purchase price, pays a cumulative dividend, and accrues unpaid dividends that increase the liquidation preference. When a liquidity event takes place, the issuer can redeem the preferred stock for its accumulated liquidation preference. The preferred stock may also have a redemption date or other time frame for achieving liquidity, often between five and ten years after the initial purchase.[378] The Alpha Agreement operates in the same way. The amounts of the advances equate to a liquidation preference, the interest adds to it, and when the Borrower achieves a liquidity event, it repays a portion of the loan with interest. The twenty-year term of the Alpha Agreement is even longer and therefore more equity-like than a typical preferred stock.

---

[378] *See* Shannon P. Pratt et al., *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* 619, 622–23 (6th ed. 2022) (discussing common features of preferred stock, including redemption provisions); *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *3 (Del. Ch. Apr. 14, 2017) (addressing mandatory redemption right beginning five years after preferred stock investment); *SV Inv. P'rs, LLC v. ThoughtWorks, Inc.*, 7 A.3d 973, 976–78 (Del. Ch. 2010) (addressing five-year preferred stock redemption right); *Shiftan v. Morgan Joseph Hldgs., Inc.*, 57 A.3d 928, 931, 938–39 (Del. Ch. 2012) (discussing ten-year preferred stock redemption provision); *Harbinger Cap.*, 906 A.2d at 224–32 (treating mandatory redeemable preferred stock as equity rather than debt).

Alpha argues that the facts do not matter because the Borrower admitted in its pleadings and in its bankruptcy filing that Alpha is a bona fide creditor. As discussed in the next section, that is simply additional evidence that Alpha's claims were collusive. A collusive admission does not bind the court.[379]

In substance, Alpha is an equity investor in the Borrower, not a bona fide creditor. As an equity investor, Alpha cannot assert fraudulent transfer claims.

## B.    Collusive Litigation

More broadly, Alpha's claims against the Borrower fail because they are collusive. "A fictitious or collusive action will not be entertained by the courts, since no actual and justiciable controversy is presented."[380]

Common law courts "require actual adverse parties."[381] A person, including a corporation, cannot sue itself.[382] A sufficient adversity of interests can exist between

---

[379] In reaching this conclusion, the court does not attribute misconduct to Alpha's or the Borrower's present or former Delaware counsel. The court suspects that at the outset of the case, they were unaware of Ritchie's control over both Alpha and the Borrower. Like the court when ruling on the motion to intervene, they credited the entities' separate status. As discovery generated information that might contradict that belief, the powerful effect of confirmation bias likely led them to discount evidence unfavorable to their clients and credit confirmatory evidence. Most notably, they may have evaluated witness credibility differently than the court. If one believes the defense witnesses and discredits Springett and Cicoski, then the facts look very different.

[380] 1A C.J.S. Actions § 70.

[381] Michael Herz, *United States v. United States: When Can the Federal Government Sue Itself?*, 32 Wm. & Mary L. Rev. 893, 901 (1991).

[382] *Id.* at 905–06.

entities in a corporate group,[383] but when it is lacking, a justiciable controversy does not exist.

As a practical matter, Alpha's claims against the Borrower involve Ritchie suing himself.

- Ritchie controls the Family Office, including the Personal Trust and the Family Trust. He also controls the Back Office.

- Through the Back Office and the Family Trust, Ritchie controls Alpha.

- Through the Back Office and the Personal Trust, Ritchie controls the Borrower.

- When Alpha filed its claims, Wolfe served simultaneously as a director of the Borrower, a director of the Back Office, a director of the Family Trustee, and a director of the Personal Trustee that controls the Personal Trust and Alpha.

- When Alpha filed its claims, Vail served as a director of the Borrower and as a director of Alpha. He verified Alpha's third-party complaint and then appeared at trial as the Borrower's client representative.

- Because of the positions Wolfe and Vail held when Alpha filed its claims, they embodied and could act contemporaneously on behalf of the entities on both sides of the purported dispute between the Alpha and the Borrower.

- The Borrower answered Alpha's complaint by admitting all of its allegations.

- Alpha and the Borrower collaborated throughout the action, coordinating on pre-trial briefing, witness presentations, post-trial briefing, and post-trial argument.

- Alpha paid the Borrower's litigation expenses.[384]

---

[383] *See, e.g.*, *Next Level Commc'ns, Inc. v. Motorola, Inc.*, 834 A.2d 828 (Del. Ch. 2003) (controlled subsidiary suing controlling-stockholder parent for breach of fiduciary duty).

[384] *See* JX 164 at 4; Yuskus Tr. 661, 663.

Alpha did not need to intervene for the Borrower to assert as a defense that Alpha's claims had priority over the Settlement Agreement. The Borrower could have made that argument itself. Instead, Ritchie caused Alpha to pretend to be adverse to the Borrower. Only the Lender's persistent efforts during discovery and at trial revealed the extent of Ritchie's control and the collusive nature of Alpha's positions.

The court will not turn a blind eye to Ritchie's effort to undo a transaction he no longer likes by causing his right hand to sue his left for something the left hand did with his knowledge and authorization. The collusive nature of Alpha's claims provides a separate and independent basis for dismissal.[385]

## C. Claim-Terminating Sanctions For Ritchie's Refusal To Appear

The plaintiffs also seek claim-terminating sanctions based on Ritchie's refusal to appear to testify at trial. If the plaintiff had subpoenaed Ritchie to appear at trial, then that sanction would have been warranted. But they did not, so the sanction is unavailable.

Through its jurisdiction over an entity, the court "can compel the biological persons who serve as its directors, officers, and managing agents to appear as

---

[385] Alpha's breach of contract claim against the Borrower for nonpayment of loans under the Alpha Agreement likewise fails. Ritchie controls both Alpha and the Borrower. The same individuals served on the boards of Alpha and the Borrower or the entities that control them. They could cause the Borrower to repay Alpha at any time. But Alpha's allegation that it demanded repayment was false. *See* Yuskus Tr. 660; Azzopardi Tr. 610. Alpha's breach of contract claim was also collusive, just like its fraudulent transfer claims. In fact, when wearing his Alpha hat, Ritchie did not really want to recover money from the Borrower. He simply wanted to block the Lender from recovering. Unsurprisingly, Alpha and the Borrower ignored Alpha's breach of contract claim against the Borrower in their post-trial briefing.

witnesses at trial or for a deposition in a particular location."[386] Ritchie caused Alpha to intervene in this action. By doing so, he subjected Alpha to this court's jurisdiction. As the individual who controls Alpha, Ritchie is Alpha's managing agent. The court could therefore compel Alpha to produce Ritchie to appear at trial, with the consequences for Ritchie's failure to appear falling on Alpha rather than on Ritchie personally.[387]

The plaintiffs had ample grounds to invoke this court's jurisdiction to compel Alpha to produce Ritchie at trial. Alpha's fraudulent transfer claims and the Borrower's defenses rested on the assertion that Ritchie knew nothing about the Loan. Rather than appearing himself to testify on those topics, Ritchie, Alpha, and the Borrower relied on witnesses who lacked personal knowledge on key events and parroted made-for-litigation conspiracy theories.[388] The plaintiffs could have

---

[386] *In re Dole Food Co., Inc. S'holder Litig.*, 110 A.3d 1257, 1262 (Del. Ch. 2015); *see Hamilton P'rs, L.P. v. Englard*, 11 A.3d 1180, 1215 (Del. Ch. 2010) ("The power to compel a corporate defendant to appear at trial would be a hollow one if it meant only that the certificate of incorporation would be placed in the witness box.").

[387] *See Summit Healthcare Operating P'ship, L.P., v. Best Years, LLC*, — A.3d —, —, 2026 WL 616183, at *2–6 (Del. Ch. Mar. 4, 2026) (holding that witness was a party's managing agent and exercising discretion to order witness to testify at trial).

[388] That tactical choice is arguably sufficient to undermine Alpha's claims. "It is a well established principle that the production of weak evidence when strong is, or should have been, available can lead only to the conclusion that the strong would have been adverse." *Smith v. Van Gorkom*, 488 A.2d 858, 878 (Del. 1985), *overruled on other grounds by Gantler v. Stephens*, 965 A.2d 695 (Del. 2009); *accord Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1118 n.7 (Del. 1994).

subpoenaed Alpha to produce Ritchie as a managing agent with personal knowledge of the facts.

But the plaintiffs did not issue a trial subpoena to Alpha to compel Ritchie to appear. The court therefore will not impose a claim-dispositive sanction as another basis for entering judgment against Alpha.

## D. The Merits Of The Fraudulent Transfer Claims

The fraudulent transfer claims also fail on their own merits. Most notably, the Borrower did not engage in any transfers with actual intent to hinder, delay, or defraud Alpha, and the Borrower received reasonably equivalent value for the transfers. But because of the court's rulings on Alpha's creditor status and the collusive nature of its claims, the court need not reach those issues.

## V. REMEDIES

Because the Lender proved breach, and because none of Alpha's or the Borrower's defenses have merit, the Lender is entitled to a remedy. The resulting remedy is multifaceted.

## A. Specific Performance

The Lender is entitled to a decree of specific performance compelling the Borrower to comply with the Settlement Agreement. To comply with the Settlement Agreement, the Borrower must actually transfer control over the Subsidiary Shares and the Properties to the Lender.

"Specific performance is a specialized form of mandatory injunction that requires a party to fulfill its contractual obligations."[389] It is "an equitable remedy designed to protect a party's expectations under a contract."[390] Specific performance requires a showing, by clear and convincing evidence, that "(1) a valid, enforceable agreement exists between the parties; (2) the party seeking specific performance was ready, willing, and able to perform under the terms of the agreement; and (3) a balancing of the equities favors an order of specific performance."[391]

The Lender has proven each element. As discussed above, the Settlement Agreement is a valid and enforceable agreement. The Lender is not only ready, willing, and able to perform; it already has performed. That leaves only the balancing of the equities.

Balancing the equities requires considering whether "specific enforcement of a validly formed contract would cause even greater harm than it would prevent."[392] The equities generally weigh against the breaching party, which only need do what it agreed to do in the first place.[393] The equities fall particularly hard against a party

---

[389] *26 Cap.*, 309 A.3d at 464.

[390] *Sarissa*, 2017 WL 6209597, at *26.

[391] *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009).

[392] *Hastings Funeral Home, Inc. v. Hastings*, 2022 WL 16921785, at *8 (Del. Ch. Nov. 14, 2022).

[393] See *Level 4 Yoga, LLC v. CorePower Yoga, LLC*, 2022 WL 601862, at *30 (Del. Ch. Mar. 1, 2022) ("[A]s CorePower breached the APA . . . the balance of equities

that has engaged in "opportunistic maneuvers to escape its contractual obligations" that "offend basic notions of equity."[394]

Here, the Borrower could have complied with its obligations easily. Instead, the Borrower contended that the Settlement Agreement was a fraud and claimed it was unauthorized. The Borrower deliberately interfered with the Lender's rights. The equities therefore weigh against the Borrower.

The equities also weigh in favor the Lender. "[I]n the absence of specific performance, [the Lender] will lose the benefit of [its] bargain under the contract."[395] The Borrower agreed in the Settlement Agreement that the Lender held the Properties and the Subsidiary Shares. To allow the Borrower to retain the Properties and the Subsidiary Shares would deprive the Lender of its security and convert it into an unsecured creditor, contrary to its agreement.

Concerns about payment further justify specific performance. The Borrower owed over $16 million in principal, interest, and fees.[396] It agreed that the Lender could take ownership of the Subsidiary Shares and the Properties in exchange for forgiving that debt. Limiting the Lender to a monetary remedy would provide

decidedly favors Level 4."); *Hastings Funeral Home*, 2022 WL 16921785, at \*8 ("I find that the equities tip in HFH's favor since it has not breached the Agreement . . . .").

[394] *Sarissa*, 2017 WL 6209597, at \*27.

[395] *Schell Bros., LLC v. Pickard*, 2023 WL 7132358, at \*3 (Del. Ch. Oct. 30, 2023).

[396] *See* Johnston Tr. 528.

105

incomplete relief. As Cicoski testified, the Borrower has faced "constant liquidity challenges,"[397] and Ritchie has a history of repurposing funds to prioritize other debts.[398] An order confirming that the Lender owns the Properties and the Subsidiary Shares is thus "more certain, prompt, complete, and efficient than a damages award."[399]

To invert the balancing of the equities, Alpha suggests that specific performance would harm the interests of "innocent third parties" (namely Ritchie's family members). That contention ignores the reality that Ritchie controls every entity in the Family Office, including the Family Trust. Ritchie cannot hide behind his wife and children to avoid a deal he authorized. Nor will holding the Borrower to its bargain cause meaningful hardship to Ritchie or anyone else. Alpha contends that Ritchie's wife has a special place in her heart for the Properties, and that may be so, but that merely reinforces the fact that the Properties are unique. The Lender is entitled to them.

The Borrower argues that specific performance is impracticable because the Properties are in St. Barts, relying on *26 Capital*. Unlike in that case, there is no risk that a decree of specific performance "would cause a citizen of a foreign country to

---

[397] Cicoski Tr. 317.

[398] *See id.* at 291.

[399] *United BioSource LLC v. Bracket Hldg. Corp.*, 2017 WL 2256618, at *4 (Del. Ch. May 23, 2017) (discussing prospect of "uncertainty" over whether the defendant could satisfy multi-million-dollar judgment and granting specific performance).

risk violating an order issued by that country's highest court" and "may cause a party to take action that could subject it to criminal contempt."[400]

Alpha last argues that specific performance is inappropriate because there is no performance left to compel. According to Alpha, because the Borrower agreed in the Settlement Agreement that the Lender owns the Subsidiary Shares and the Properties, everything that needed to be done has been done, so there is no need for a decree of specific performance.

Alpha confuses the legal effect of an agreement with the reality on the ground. The Lender indeed owns the Subsidiary Shares and the Properties as a result of the Settlement Agreement. But that does not mean the Borrower complied with its commitment by giving up actual control over those assets. Envision a residential real estate transaction in which the seller agreed that the buyer owned the house, but then never vacated the property, changed the locks to keep the buyer out, and kept living in the house. Nominal legal title would have passed, but a court still could issue a decree of specific performance to eject the seller from the property. That is the case here.

The decree of specific performance will require the Borrower to take all actions necessary to establish the Lender's ownership and control over the Subsidiary Shares and the Properties. The Borrower must take all actions necessary, in the reasonable judgment of the Lender, to:

---

[400] *26 Cap.*, 309 A.3d at 471.

- remove any uncertainty about the domestication of the Island Subsidiary as the Florida Subsidiary;

- remove any uncertainty about the Lender's title to the Subsidiary Shares;

- ensure that the Florida Subsidiary is the sole owner of the Properties, free of any liens and encumbrances; and

- ensure that the Lender can access the Properties.

## B. Injunctive Relief

The Lender is also entitled to permanent injunctive relief. That relief involves both negative and affirmative elements.

A permanent injunction is a form of final relief that prohibits a party from taking action or compels a party to take action. In its negative version, it is "a decree of the court whereby defendant is perpetually inhibited from the assertion of an assumed right, or perpetually restrained from the commission of an act which would be contrary to equity and good conscience."[401] In its affirmative or mandatory version, it is a decree that orders a party to take action on pain of contempt.[402]

"Because a permanent injunction is final relief, it does not require a showing of imminent irreparable harm."[403] A preliminary injunction requires that showing to justify the issuance of interim relief before the case can be adjudicated on the merits.

---

[401] James L. High, *A Treatise on the Law of Injunctions as Administered in the Courts of the United States and England* § 3, at 4 (1879), *quoted in In re COVID-Related Restrictions on Religious Servs.*, 285 A.3d 1205, 1228 (Del. Ch. 2022).

[402] *See* 2 Monica E. McFadden, *Litigating Tort Cases* § 13:4, at n.11 (2024) (collecting authorities).

[403] *COVID-Related Restrictions*, 285 A.3d at 1228.

Once the case has been adjudicated, the need for interim relief is no longer a consideration, so that showing is no longer necessary. A permanent injunction instead requires a showing that other remedies are inadequate.[404] A showing of irreparable harm can satisfy that requirement, but other ways exist, including:

- Showing that the defendant acted "in such a way that the plaintiff may be required to bring more than one suit to effectuate his legal remedy . . . ."[405]

- Showing that although money could be an adequate remedy, "the defendant is insolvent and [the judgment] is not collectible."[406] In this setting, a permanent injunction may issue if "the defendant is still capable of rendering the performance to which the plaintiff is entitled as an alternative to the money . . . ."[407]

- Showing that the plaintiff is entitled to damages "if damages could be measured with any reasonable degree of accuracy, but under the facts damages are so speculative that any award is likely to be inadequate."[408]

This decision has explained twice why a legal remedy is inadequate, first when holding that this court can exercise subject matter jurisdiction and again when holding that specific performance is an appropriate remedy.

The final order will provide for a negative permanent injunction barring the Borrower, Alpha, their associates and affiliates, and anyone acting in concert with

---

[404] *Id.*

[405] Dan B. Dobbs, *Law of Remedies: Damages—Equity—Restitution*, § 2.5, at 57 (2d ed. 1993).

[406] *Id.*

[407] *Id.* at 57–58.

[408] *Id.* at 58.

them from (1) asserting any rights to ownership or control over the Subsidiary Shares and the Properties and (2) interfering with the Lender's ownership and control over the Subsidiary Shares and the Properties.

The final order will provide for a mandatory permanent injunction requiring the Borrower to take the actions described in the section addressing the decree of specific performance. If a reviewing court were to interpret the remedy of specific performance strictly as available only to enforce a contractual provision requiring action, then a mandatory injunction grounded in equity can provide equivalent relief. The arguably duplicative relief of specific performance and a mandatory injunction will hopefully avoid any remedial slipups that could leave the Lender without a means of enforcing its rights.

The final order also will provide for a mandatory injunction compelling Alpha to transfer any Subsidiary Shares to the Lender. In the Loan Agreement and again in the Settlement Agreement, the Borrower represented that it owned 100% of the Subsidiary's equity. During this case, the Borrower and Alpha claimed that a third party owned 1% of the equity, rendering those representations false. Alpha has subsequently acquired that share. Alpha must convey that share to the Lender so that the Lender receives 100% of the equity in the Subsidiary.

## C.    Damages For Loss Of The Building Permit

The Lender is also entitled to an award of damages for harm the Borrower caused by breaching the Settlement Agreement.

When the Borrower breached the Settlement Agreement by preventing the Lender from accessing the Properties, the Borrower harmed the Lender by delaying

construction. During the delay, the Lender's building permit expired. The Lender had made enough progress on construction to secure an extension until July 28, 2025, but the Lender need to continue construction to keep the permit in force. The Borrower prevented that from happening by changing the locks, sending cease-and-desist letters to the Lender's architect, and sending its frivolous criminal complaint to the local authority in St. Barts. The Lender promptly sought relief from this court, but the Borrower managed to derail this litigation by obstructing discovery, filing for bankruptcy, and removing the case to federal court twice. Those actions prevented the Lender from obtaining interim relief before the building permit expired. The environmental sensitivity of the Properties makes it unlikely that the Lender can obtain a comparable permit.[409]

Because the Borrower's breach of the Settlement Agreement resulted in the Lender's loss of a unique and valuable building permit, restoring the Lender's ownership and possession of the Properties alone will not make the Lender whole. The Lender is also entitled to damages.

"Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty."[410] But "[w]here the injured party has proven the *fact* of damages—meaning that there would have been some profits from the contract—less certainty is required of the proof establishing the

---

[409] *See* Springett Tr. 101.

[410] Restatement (Second) of Contracts § 352.

*amount* of damages.[411] "Courts in Delaware and other jurisdictions have frequently applied the 'wrongdoer rule' where the wrongdoer's breach contributed to uncertainty over the amount of damages."[412] When uncertainty as to damages results from a defendant's conduct, "fundamental justice requires that . . . the perils of such uncertainty should be laid at defendant's door."[413]

The Lender proved the fact of damages. Quantifying those damages requires determining the difference between (1) the value of the Properties with the improvements, less their cost of completion, and (2) the value of the Properties without improvements. The Lender provided a real estate appraiser's report valuing the Properties at €12 million in December 2023 without improvements and in a range of €15–€16 with improvements.[414] The lower end of the latter range points to damages of €3 million. The Borrower decries these figures as speculative, but the Lender responds that more exacting figures are not available because the Borrower interfered with the renovations early in the process.

The Lender's appraisal is sufficient to support a damages remedy. The Borrower caused the uncertainty about damages by breaching the Settlement

---

[411] *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1131 (Del. 2015).

[412] *Id.* at 1131 n.132 (collecting cases).

[413] *Am. Gen. Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 10 (Del. Ch. 1992) (internal quotation marks omitted).

[414] JX 242 at 8–9; *see* JX 243 at 8–9.

Agreement, so the Borrower cannot be heard to complain about the absence of a more specific estimate.

The final order will award €3 million in damages. The plaintiffs are also entitled to pre-judgment and post-judgment interest at the legal rate, compounded quarterly, from July 29, 2025, through the date of payment. If the legal rate changes during a compounding interval, then the new rate becomes effective at the beginning of the next compounding interval.

## D.     Fee Shifting For Bad Faith Litigation Conduct

Another element of the remedy is an award of expenses, including attorneys' fees. Delaware follows the American Rule, under which "litigants are normally responsible for paying their own litigation costs."[415] But the Supreme Court "has recognized limited equitable exceptions to that rule, including the exception for 'bad faith' conduct during the litigation."[416] The court applies this exception both to mitigate the harm the affected party has suffered and "to deter abusive litigation and to protect the integrity of the judicial process."[417] An award is warranted here.

Delaware courts have shifted fees under the bad faith exception where defendants "forced the plaintiff to engage in litigation that would not have been

---

[415] *Mahani v. Edix Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

[416] *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005).

[417] *Id.*; *see Martin v. Harbor Diversified, Inc.*, 2020 WL 568971, at *1 (Del. Ch. Feb. 5, 2020) ("[I]t is a method for reducing and appropriately allocating the costs of vexatious behavior sufficiently serious that justice requires such mitigation."), *aff'd*, 244 A.3d 682 (Del. 2020).

necessary if the defendants had acted with even minimal responsibility."[418] Delaware courts have also awarded expenses (including attorneys' fees) where parties "defended the action despite their knowledge that they had no valid defense," "delayed the litigation and asserted frivolous motions," "falsified evidence," or "changed their testimony to suit their needs."[419]

Ritchie, his associates, and his affiliates—including both the Borrower and Alpha—engaged in egregious litigation misconduct that warrants an award of expenses.

First, Ritchie caused Alpha to intervene in this litigation and assert collusive claims. Through that effort, Ritchie sought again to sow anarchy in the civil justice system.[420]

Second, Alpha and the Borrower made allegations that were recklessly misleading or knowingly false. They claimed falsely that the Loan was a sham. The Borrower asserted in its affirmative defenses to the plaintiffs' complaint that it "did not receive any funds that were allegedly wired."[421] And Alpha alleged in its third-party intervenor complaint that the Lender "never intended to loan any money to [the

---

[418] *Montgomery Cellular*, 880 A.2d at 228.

[419] *Id*; *see Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 546 (Del. 1998).

[420] *See* JX 7 at 57–58.

[421] Dkt. 28 at 26.

Borrower] and never actually delivered any money to [the Borrower]."[422] Alpha and Vail doubled down on these assertions at trial.[423] In fact, the Borrower both benefited from the Loan and received a portion of the proceeds in its bank account.[424]

Alpha and the Borrower also claimed that they were unaffiliated, independent entities. When supporting Alpha's motion to intervene, the Borrower claimed that "[t]here is no basis for Plaintiffs' assertion that Alpha Carta and Green Sapphire are affiliates with common owners," and represented that "Thane Ritchie does not control the Petro Carta Trust (Green Sapphire's sole stockholder)."[425] In fact, Ritchie controls both entities, which are part of his Family Office.[426]

In addition to those big falsehoods, Alpha claimed it had demanded payment from the Borrower of all amounts under the Alpha Agreement.[427] In reality, Alpha never made a demand before filing its third-party complaint.[428]

Third, Alpha and the Borrower sought to delay and derail this litigation. When the litigation began to move forward on an expedited basis, the Borrower tactically

---

[422] Dkt. 67 ¶ 48.

[423] *See* Vail Tr. 729–30; Dkt. 276 at 50.

[424] *See* JX 60; JX 164 at 7; Johnston Tr. 512–17; Cicoski Tr. 281–82; Wolfe Tr. 708–09.

[425] Dkt. 65 at 4.

[426] *See* Cicoski Tr. 226–27, 295; JX 169 ¶ 37.

[427] Dkt. 67 ¶ 169.

[428] *See* Yuskus Tr. 660; Azzopardi Tr. 610.

filed for bankruptcy. Then, when it appeared the Lender would secure relief from the stay, the Borrower modified hundreds of entries in its general ledger to support Alpha's claims.[429] After the bankruptcy court lifted the stay, the Borrower removed the lawsuit twice on the same grounds. Each time the district court promptly remanded the case, noting on the second occasion that the Borrower had acted improperly and was obstructing the bankruptcy court's order.[430] During discovery, the Borrower repeatedly missed deadlines and exhibited "an overall lack of transparency and inability to follow through on its commitments to the other parties."[431] Ritchie sought to avoid giving a deposition, requiring the Lender to seek relief from the court twice.[432]

Shifting expenses (including attorneys' fees) is warranted under the bad faith exception to the American Rule. The plaintiffs are entitled to recover all of the litigation-related expenses, including attorneys' fees and costs. The Borrower and Alpha are jointly and severally liable for the amount.

---

[429] *See* JX 169 at 24–25; Johnston Tr. 497–500; Wolfe Tr. 710–11; Yuskus Tr. 658–59.

[430] Dkt. 192. *See* 14C C. Wright & A. Miller, *Federal Practice & Procedure* § 3739 (Rev. 4th ed. 2025) ("After a case has been remanded to state court, a second notice of removal on the very same ground that led to the initial removal is likely to be rejected by the district court and may be considered to have been interposed in bad faith."). A party may have a legitimate, good-faith basis to file for bankruptcy or remove a case to federal court. Here, the Borrower did not.

[431] Dkt. 288 at 3.

[432] *See* Dkt. 193; Dkt. 217; Dkt. 224; Dkt. 236.

## E. Equitable Subordination

The last issue is equitable subordination. This decision has awarded relief to the Lender, including awards of damages. To ensure that Alpha cannot use the Alpha Agreement to interfere with the Lender's ability to pursue the Borrower for those amounts, any claims Alpha has against the Borrower under the Alpha Agreement are subordinated to the judgment.

"Equitable subordination is a doctrine that, based on a creditor's inequitable conduct and its effect on other creditors, allows that creditor's debt to be subordinated to other claims in bankruptcy or allows the creditor's liens to be transferred to the bankruptcy estate."[433] The court has applied the doctrine to ensure that a wrongdoer could not use the fruits of its wrongdoing to interfere with the collection of a judgment.[434]

As discussed previously, the Alpha Agreement is, in substance, an equity investment. It therefore should be junior to the Lender's recovery. In light of Alpha's

---

[433] *Nelson v. Emerson*, 2008 WL 1961150, at *4 (Del. Ch. May 6, 2008).

[434] *In re Dura Medic Hldgs., Inc. Consol. Litig.*, 331 A.3d 796, 830 (Del. Ch. 2025) ("The Comvest Parties engaged in the Challenged Financings at the Company level. That gave those financings structural priority over the Seller Note, which Holdings issued. As a remedy for the Comvest Parties' legal and equitable violations, the Challenged Financings are equitably subordinated to be junior to the Seller Note."); *GB-SP Hldgs., LLC v. Walker*, 2024 WL 4799490, at *1 (Del. Ch. Nov. 15, 2024) ("And, as a remedy for the creditor's aiding and abetting that breach, its debt is equitably subordinated as to any amounts collected or received by or on behalf of the Company from the directors as a result of that disgorgement."); *Lake Treasure Hldgs., Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179, at *9 (Del. Ch. Oct. 10, 2014) ("Klee's loan to the Partnership in the amount of $136,200, together with any interest, is equitably subordinated to the claims of all other creditors.").

bad-faith conduct, equitable subordination is warranted. The amounts due under the judgment have priority over any amounts that Alpha has advanced to the Borrower.

## VI. POST-TRIAL MOTIONS

On the eve of post-trial argument, Alpha and the Borrower filed two post-trial motions. Both are denied.

### A. Alpha's Motion To Reopen And Supplement The Record

During this litigation, Cicoski testified about receiving multiple threats, including that a "man with a gun arrived at my home after nightfall" to deliver a "vitriolic" letter from out-of-state litigation counsel for the Family Office.[435] Cicoski's counsel filed a letter informing the court of several additional threatening text messages he received after trial.[436] McHugh also testified that she received threatening messages before her deposition.[437] After trial, Alpha moved to reopen and supplement the trial record to respond to those allegations and introduce evidence about threats to Wolfe.[438] Alpha seeks to introduce its own evidence to rebut the inference that Ritchie, Alpha, or the Borrower were behind the threats to Cicoski and McHugh.

---

[435] Cicoski Tr. 311–12.

[436] Dkt. 281.

[437] McHugh Dep. 10–16.

[438] Dkt. 287.

The court has not made any factual findings about the alleged threats, has not drawn any inferences based on the threats, and has not taken the representations about threats into account when evaluating credibility or weighing the evidence. Reopening and supplementing the trial record is unwarranted. Alpha's motion is denied.

## B. The Borrower's Motion To Dismiss The Florida Subsidiary For Lack Of Standing

On the morning of post-trial argument, the Borrower moved to dismiss the Florida Subsidiary on the theory that it is not a party to the Settlement Agreement.[439] That argument comes too late. The Lender caused the Florida Subsidiary to sue because the Lender believed it controlled the Florida Subsidiary and the Florida Subsidiary should have held title to the Properties. The Borrower created uncertainty by claiming that the Island Subsidiary was never properly redomiciled in Florida and continues to exist as a separate entity under a different name. The Florida Subsidiary is a proper party for purposes of that relief. The Borrower's motion is denied.

## VII. CONCLUSION

Judgment will be entered for the plaintiffs and against the Borrower. The judgment will include a declaration that the Lender is the rightful owner of the Subsidiary Shares and the Properties. The Borrower must take all actions necessary to remove any doubt about the domestication of the Island Subsidiary in Florida as the Florida Subsidiary, the transfer of the Subsidiary Shares to the Lender, and the

---

[439] Dkt. 289.

transfer of title to the Properties to the Lender. The Lender is entitled to damages of €3 million, plus pre-judgment and post-judgment interest through the date of payment.

The court will enter judgment against Alpha on all of its claims.

The court awards the Lender its expenses, including attorneys' fees. If the parties cannot agree on an amount, then the Lender may move to quantify the award.

Alpha's loans to the Borrower are equitably subordinated to the Lender's recovery.

Within thirty days, the parties must submit proposed final order that is agreed as to form. If there are issues that need to be addressed before a final order can be entered, then the parties must submit a joint letter identifying those issues and proposing a path forward. Any remaining items must be existing issues that need to be addressed to resolve this proceeding. This instruction is not an invitation to raise new issues or seek a do-over.